THE ATCHISON TOPEKA & SANTA FÉ RAILROAD COMPANY v. THOMAS PLUNKETT, *Administrator of the estate of Peter Plunkett, deceased.*

1. EVIDENCE, *Not Erroneously Excluded.* In an action against a railroad company for damages for negligently causing the death of one of its employés, it is not error for the court on the trial to exclude evidence offered by the railroad company to prove certain written or printed rules, which it claims the deceased wrongfully disregarded, when it is not shown that the deceased ever had any knowledge of such written or printed rules.

2. GENERAL FINDINGS, *When Ignored.* And in such an action the supreme court cannot say that the trial court, when submitting the case finally to the jury, committed material error by submitting to the jury such general questions as the following:

"10. Was the death of said P. caused by the wrongful act or omission of the defendant?

"11. Could the defendant, by the exercise of reasonable and ordinary care on its part, have prevented the injury complained of?

"12. Was the death of P. caused by the gross negligence of the defendant?

"13. At the time of the injury complained of, was P. in the exercise of reasonable and ordinary care?

"14. At the time of the injury complained of, was P. guilty of any negligence that proximately contributed thereto?"

Where such general questions as the above are submitted to the jury along with numerous specific questions, and the jury make findings in answer to both the general and the specific questions, then if it can be seen that the general findings are mere conclusions drawn by the jury from the facts found and stated in the answers to the specific questions, the general findings may then be wholly ignored and disregarded, whether they agree with or contradict the specific findings.

3. ——— It is generally error for the trial court to refuse to submit to the jury questions of fact material to the case and based upon the evidence.

4. RAILROAD COMPANY, *When not Negligent.* Where a railroad company is in the habit of receiving from other railroads cars loaded with timbers which project over the ends of the cars so as to make it dangerous for any one except a careful, skillful and prudent person to attempt to couple the cars together, it is not negligence for the railroad company to order and permit such a person, who has been in the employ of the railroad company doing that kind of business for about five months, to attempt to make such a coupling, where the attempt is to be made in broad daylight, although it may be raining at the time.

5. NEGLIGENCE; *Misleading Instruction.* It is misleading and erroneous for the court to instruct the jury that negligence remotely contributing to the injury is not material, when in fact, if there was any negligence at all, it was clearly direct and proximate, and not remote or far removed from the injury.

6. ——— Other matters discussed in the opinion.

*Error from Atchison District Court.*

ACTION brought by *Thos. Plunkett*, as administrator of the estate of Peter Plunkett, deceased, against the *Railroad Company*, to recover damages alleged to have resulted from the negligence of the defendant in wrongfully causing the death of said Peter Plunkett. Trial at the June Term, 1879, of the district court, and judgment for the plaintiff. The defendant brings the case here. The opinion states the facts.

*Ross Burns, A. A. Hurd*, and *W. C. Campbell*, for plaintiff in error.

*Everest & Waggener*, for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: This was an action brought by Thomas Plunkett, administrator of the estate of Peter Plunkett, deceased, against the Atchison, Topeka & Santa Fé railroad company, for damages alleged to have resulted from the negligence of the defendant in wrongfully causing the death of said Peter Plunkett. The case of the plaintiff (who is now

defendant in error), as he alleges it, and as he claims to deduce it from the findings of the jury, is substantially as follows:

On the 28th day of June, 1878, Peter Plunkett was killed by being caught between the timbers loaded on two cars then in the car-yard of the Atchison, Topeka & Santa Fé railroad company, at Atchison, Kansas. At the time of his death, Peter Plunkett was in the employ of the railroad company, as brakeman or yard switchman. At the time he was killed he was in the discharge of his duty as brakeman or yard switchman, and had been in the employment of the railroad company for about five months previous to his death, which was on June 28, 1878. He was killed while attempting to couple two cars in the railroad company's yard, then loaded with projecting timbers. The yard-master of the railroad company instructed and ordered Plunkett to couple two flat cars that were then improperly and negligently loaded with projecting timbers. Five to eight hours previous to the death of Peter Plunkett, the yard-master had notice of the manner in which said cars were loaded. After the yard-master of the railroad company had knowledge of the manner in which the timbers of said cars were projected, he ordered and instructed Peter Plunkett to couple the same together. In obedience to such order of the yard-master, Peter Plunkett attempted to make the coupling of said cars, so loaded with projecting timbers. The death of Peter Plunkett was caused by the wrongful act and omission of the railroad company. The railroad company, by the exercise of reasonable and ordinary care on its part, could have prevented the injury complained of. The death of Peter Plunkett was caused by the gross negligence of the railroad company. At the time of the injury complained of, Peter Plunkett was in the exercise of reasonable and ordinary care. At the time of the injury complained of, Peter Plunkett was not guilty of any negligence that proximately contributed thereto. As such brakeman or yard switchman, Peter Plunkett was under the control and direction of said yard-master of the railroad company. As such brakeman and yard switchman, it was in the line of Peter Plunkett's duty to couple and uncouple cars. The yard-master of the railroad company ordered and instructed Peter Plunkett to couple said cars just previous to receiving the injury complained of. At the time of the injury complained of, Peter Plunkett was in the exercise of that degree of care that prudent men would ordinarily exercise under like circumstances.

The findings of the jury, if we take their general conclusions, were substantially as claimed by the plaintiff, the defendant in error. Their general verdict, and all or nearly all of their general conclusions, whether of law or fact, were in favor of the plaintiff and against the defendant. And about the only findings of the jury which were favorable to the defendant were those findings which stated the facts in considerable detail. And even those findings which stated the facts in detail were fully as favorable to the plaintiff as the evidence would warrant; and indeed some of them were entirely too favorable. The principal findings of the jury tending to show liability or non-liability on the part of the defendant, are as follows:

*Question* 1. Was not Peter Plunkett, at the time of his death, on June 28, 1878, within ten days of being seventeen years old? *Answer:* Yes.

Q. 2. Was he not a very stout, active and healthy young man at the time of his death? A. Yes.

Q. 10. Was not the occupation of Peter Plunkett at the time of his death a brakeman and yard switchman in the employ of defendant? A. Yes.

Q. 12. Did not Peter Plunkett just before he met his death uncouple two flat cars, loaded with timbers or other material, from the engine and train, and proceed alone, and unaccompanied by any one, with said two cars, the said cars being moved forward by their own gravity, the track being slightly down grade, and having been started by a push from the engine, toward another car loaded with timbers, some distance east of said Plunkett? A. He did—the east car being a flat car, and loaded with timber.

Q. 13. Was not said Peter Plunkett at the forward end of the said two cars, as they were then going? And if not, where was he? A. Yes; on the forward end of east car.

Q. 14. Was he not standing by the brake on top of said car, and close by the end of said car, and near to the end of the projecting timbers on said car? A. He was.

Q. 16. Did not Peter Plunkett, in attempting to make said coupling of said car, bend his knees, depress his body, and bow his head, and assume a squatting position, for the purpose of clearing the projecting ends of the timbers on the cars he was trying to couple when the cars should come

together, and while he was making the coupling?    A. Yes, he did.

Q. 17. When the said cars came together, did not the ends of the timbers on the two cars catch his head between them immediately back of the ears, and thereby kill him?    A. Yes.

Q. 18. At the time Peter Plunkett rode down those cars and attempted to make said coupling, was there any obstacle or obstruction to prevent his seeing the car, and its condition, and the manner it was loaded, upon which he rode?    If there was, state what the obstacle or obstruction was.    A. Yes, it was raining hard at the time.

Q. 19. Was there any obstacle or obstruction to prevent the said Peter Plunkett from seeing the car toward which he was moving, its condition, and manner of loading?    And if there was, state what the obstacle or obstruction was.    A. There was no obstacle.    Moving toward another car, it is impossible to tell how far timbers project.

Q. 20. What distance from the place where the said Peter Plunkett took charge of said two moving cars was it to the place where the standing car was, and where he met his death?    A. From six to eight car-lengths.

Q. 21. Would the said Peter Plunkett have been injured by the projecting ends of the timbers on said cars, or by anything else, if he had taken the precaution or care to have bent his head low enough to be below the line of said projecting timbers?    A. He used ordinary care and precaution.

Q. 22. Did not Peter Plunkett fail in his attempt to clear his head from the ends of the projecting timbers on said cars, while trying to make said coupling?    A. He did.

Q. 24. How far over the ends of said cars did the said timbers project?    A. The west end of east car, part of the timbers projected two feet; the east end of west car, part of timbers projected from one to twelve inches.

Q. 26. Were not the cars between which Peter Plunkett was killed received by the defendant from a connecting line east on the morning of June 28, 1878, then already loaded, and in the same manner that they were at the time he was killed?    A. Yes.

Q. 28. How long had said cars, loaded as they were, been in the possession of the defendant prior to the time of Peter Plunkett's death?    State the time in hours, as near as you can.    A. From five to eight hours.

Q. 29. Was it not before and at the time of Peter Plunk-

ett's death a frequent occurrence on the line of defendant's road to receive and load long railroad iron and timbers on cars with the same projecting over the ends of the cars? A. It was.

Q. 36. Was it not one of the duties of a yard switchman or brakeman on the line of defendant company's railroad, at the time Peter Plunkett was employed in that capacity by defendant company, to couple together cars loaded with timber, iron and other material projecting over the ends of the cars? A. It was.

Q. 37. Were not flat-cars frequently and ordinarily received by defendant company at its yard in Atchison during the time said Plunkett was so employed, loaded with timber and other material, projecting over the ends of the cars in the same manner as the cars were loaded, which said Plunkett was attempting to couple at the time he met with the accident causing his death? A. They were not.

Q. 38. Did not Peter Plunkett, prior to the time of his death, during the time of his employment by defendant, make couplings of cars loaded with lumber projecting over the ends of the cars? And if so, how often? And how close did the projecting timbers come together after such coupling had been made? A. We do not know that he made such couplings.

Q. 41. How long was Peter Plunkett employed in the Atchison yard as yard switchman or brakeman prior to his death? A. About five months.

Q. 42. How long had Peter Plunkett been engaged in working for different railroads prior to his death? A. About five months.

Q. 43. Did not Peter Plunkett know at the time he attempted to make the coupling of the two cars, when he met with the accident causing his death, the material with which said cars were loaded, and that the same projected over the ends of the cars, so as to make it dangerous to attempt to make the coupling? A. He did.

Q. 44. Did not Peter Plunkett have opportunity to know, by the reasonable use of his faculties, the material with which, and the manner in which, the two cars were loaded, which he tried to couple together at the time he met with the accident causing his death? A. He knew they were loaded with timbers, but lacked sufficient knowledge of how said cars were loaded.

Q. 45. Did not Peter Plunkett, at the time he attempted to

couple together the two cars when he met with the accident, bend his knees, bow his head, and place himself in a stooping position? And if so, what did he place himself in that position for? A. He did. To make the coupling and to avoid the danger.

Q. 46. Did not Peter Plunkett, during all the time he was employed by the defendant company, constantly work in the Atchison yard? And was he not at the time employed in making up trains in that yard — coupling and uncoupling cars and turning switches? A. He did. As long as employed as yard switchman.

Q. 47. Was it not the duty or service for which Peter Plunkett was employed by the defendant company, to work in the Atchison yard, turn switches, couple and uncouple cars and make up trains, whenever it became necessary that such service should be performed in carrying on defendant's business as a common carrier, and in forwarding the freight and cars consigned to it by other companies to be forwarded or transported over defendant's line of railroad? A. It was.

The jury further answered, that there was a defect in the load of each of the cars deceased attempted to couple; that it was not the custom of this company to couple such cars with a long draw-bar; and that it is the custom of railroads generally to couple such cars with an ordinary coupling-link, as the plaintiff in this case attempted to do.

In addition to these answers, the jury further found, that the deceased was in the exercise of care, and the company was guilty of gross negligence, as has already been stated. The specific facts were not given, but these were the conclusions as found by them.

The jury also made the following findings:

Q. 8. Did the yard-master of the defendant, after having knowledge of the manner in which the timbers on said cars projected, order and instruct Peter Plunkett to couple the same together? A. Yes.

Q. 9. In obedience to the orders of the yard-master, did said Peter Plunkett attempt to make the coupling of said cars so loaded with projecting timbers? A. Yes.

Q. 15. As such brakeman or yard switchman was Peter Plunkett under the control and direction of said yard-master of the defendant? A. Yes.

Q. 17. Did the yard-master of defendant order and instruct said Peter Plunkett to couple said cars just previous to Peter Plunkett's receiving the injury complained of? A. Yes.

The jury also found a general verdict in favor of the plaintiff and against the defendant, and assessed the damage at $1,300, for which amount, with costs, the court below rendered judgment in favor of the plaintiff and against the defendant. The defendant now, as plaintiff in error, brings the case to this court for review.

The defendant (plaintiff in error) now claims that it is not liable to the plaintiff in any amount whatever; and it claims this upon the facts as proved and even as found by the jury. It raised the question of its liability in the court below in various ways: As, by demurring to the plaintiff's evidence; by moving for judgment in its favor on the findings of the jury; and by moving for a new trial on the ground that the verdict and findings against it were not sustained by sufficient evidence, but were against the evidence. The defendant (as plaintiff in error) also claims that the court below not only erred in overruling these motions, but that it also erred in excluding certain evidence from the jury, and in submitting certain questions to the jury for them to find upon, and in refusing to submit certain other questions to the jury for them to find upon, and in giving certain instructions to the jury, and in refusing to give certain other instructions to the jury. All these questions are now properly and fairly before this court. But the great and paramount question is the first one named, to wit: Is the defendant liable at all, under the unquestioned and undisputed facts of the case?

I. We do not think that the court below erred in excluding said evidence, for, among other reasons, no sufficient foundation was laid for its introduction. There was no evidence introduced tending to show that Peter Plunkett, the deceased, ever had any knowledge of the defendant's written or printed rules and regulations which the defendant offered to introduce in evidence, and which it claims the deceased wrongfully disregarded. Therefore it was not error to exclude the evidence.

II. We cannot say that the court below committed any material error in submitting to the jury the questions objected to by the defendant; and yet we cannot see how any substantial benefit was to be derivèd from such submission. These questions, or at least the most of them, were very comprehensive in their character, were couched in very general terms, and when answered, they, with their answers, furnished but very little more evidence of the primary and fundamental facts of the case than did the very comprehensive statements of the general verdict itself. The principal of these questions, with the answers thereto as given by the jury, are as follows:

"Q. 10. Was the death of said Peter Plunkett caused by the wrongful act or omission of the defendant? A. Yes.

"Q. 11. Could the defendant, by the exercise of reasonable and ordinary care on its part, have prevented the injury complained of? A. Yes.

"Q. 12. Was the death of Peter Plunkett caused by the gross negligence of the defendant? A. Yes.

"Q. 13. At the time of the injury complained of, was Peter Plunkett in the exercise of reasonable and ordinary care? A. Yes.

"Q. 14. At the time of the injury complained of, was Peter Plunkett guilty of any negligence that proximately contributed thereto? A. No."

There can be no such thing as reaching ultimate facts. And this is true, whether we are attempting in the line of causes and effects to reach first or original facts, or are attempting by division and subdivision to reach simple and primary facts. All facts are caused by antecedent and pre-existing facts, and all facts in turn become the prolific source and origin, the potent and efficient causes of still other and succeeding facts. No fact springs into existence of itself, and no fact is wholly isolated from other facts. All facts constitute a chain, or rather net-work of causes and effects, from the creation down to the present time, and as we cannot by any possibility reach to the beginning of creation, we therefore cannot by any possibility reach first or original facts, or isolated facts. Nor can we by any possibility reach ultimate simple facts. Whether, indeed, there are any such

things as ultimate simple facts, is as much a debatable question as whether there are ultimate atoms of matter, or ultimate portions or divisions of time or space. Facts, when brought into existence, must in the nature of things occupy time and space in coming into existence, and in having an existence. Hence they must in the nature of things be as endlessly divisible into smaller portions as the time and space which they occupy, which are generally believed to be infinitely divisible. Hence the minutest fact that comes within our comprehension must necessarily be composed of an infinite number of still smaller facts; and hence we cannot know anything of ultimate simple facts. Our knowledge really extends only to comprehending (and that obscurely) compound facts, or complex facts. And as all facts are connected more or less intimately with other facts — being first effects, and then causes — they may all be used as proof of these other facts with which they are connected, or may in turn be proved by them. They may be the probative facts, the evidential facts, or the final facts to be proved. They may be the evidence of the facts, or the facts to be finally proved or found. And all findings of fact, whether of a court or a jury, or a referee, are necessarily mere conclusions or inferences drawn from the evidence — that is, drawn from other facts. It is, therefore, not a valid objection to a finding of a jury that it is the finding of a compound fact, or a complex fact, or a comprehensive fact including many minor and subordinate facts, or that it is a conclusion, or an inference from the evidence or from other facts; for all findings must necessarily be subject to these same objections. The jury's findings are always conclusions. They cannot be otherwise; and the jury cannot in any case, or in any sense, find ultimate facts. They can find the facts in great detail, or they can find them in very general or comprehensive terms. And where they find the facts both in detail and in general terms, we may disregard the general findings. If the findings in detail contradict the general findings, we may order the judgment to be rendered in accordance with the findings

in detail, and wholly ignore the general findings. For instance: Where a question of negligence arises in a case, the jury cannot be allowed to say conclusively, after finding certain special facts, that these facts constitute negligence, when in fact and manifestly they do not constitute negligence. But in order to disregard the general conclusions of the jury, it is necessary that it may be seen that they are only general conclusions from the special facts which have already been sufficiently ascertained or found. Otherwise, it would be necessary to regard such general conclusions as general findings of fact. Many of the general findings in this case must be disregarded, for they are not only against the evidence, but they are also in conflict with the findings of the jury made in detail; that is, with the special facts found by the jury.

III. The court below refused to submit the following among other questions to the jury, to wit:

" Q. 15. Was not the said car on which he was riding, proceeding at a slow rate of speed, and of the speed of the ordinary walk of a man, and sufficiently slow to permit the said Plunkett to climb on the south side of the car, and to then walk along with it, and when it arrived where another car was standing, for him to then walk in front of said car, and to then bend down, and stoop his body in order to make the coupling between the cars on which he rode, and the one standing on the track?"

This was not refused because of its leading form, but because the court below did not regard it as a proper question to be submitted to the jury. We think the court below erred. We know of no good reason why it should not have been submitted. It embodies questions of fact material to the case, and was based upon the evidence. It is generally error for the trial court to refuse to submit to the jury questions of fact, material to the case, and based upon the evidence.

IV. We shall consider all the other questions together. And the main question is this: In what consisted the negligence (if any there was) which caused the death of Peter Plunkett? If the defendant was guilty of negligence at all, it must have been in ordering and permitting (through its

yard-master, Joseph A. Russell) the deceased to attempt to couple said cars. And if the deceased was guilty of any contributory negligence, it must have been either in not properly observing the manner in which the cars were loaded, or in not stooping a little lower in attempting to make the coupling. It cannot be said that the defendant was guilty of negligence (that is culpable negligence) in receiving the cars, for the mere reception of them could not by any possibility have injured any one. If the cars had been immediately unloaded, or if for any cause no attempt had been made to couple them, the accident would not and could not have happened. It is not claimed that there was any negligence except in the respects above mentioned; that is, in the defendant receiving the cars and in ordering and permitting the deceased to couple them, and in the deceased not observing how the cars were loaded, or in not stooping low enough to avoid the danger. It is admitted that the deceased knew the condition of the weather, the condition of the ground, the condition of the track, the condition of the cars (not including the manner in which they were loaded), and the manner in which the cars were to be coupled, as well as the defendant or any of its other servants or agents did; and hence if the defendant was guilty of negligence in any of these respects, the deceased must also have been guilty of negligence in at least as high a degree as the defendant, and therefore in either case, that is, whether there was any negligence or not in any of these respects, the plaintiff cannot recover. The deceased knew that it was raining, and knew that he was to couple the cars without an engine being attached to either of them, and no complaint is made of anything else by the plaintiff, except the manner in which the cars were loaded. The brakes were in good condition, and the deceased might have stopped the cars at any point. Indeed, the deceased was master of the situation. Almost every act (if not every one) that directly contributed to bring about the injury was the sole act of the deceased. He uncoupled from the engine the two cars which were to be coupled to the third car; and after the two cars

were thus uncoupled from the engine (which engine was behind these two cars), the engineer by means of the engine gave the two cars a slight push forward and eastwardly, starting them toward the third car, to which they were to be coupled. This was the last act, performed by any person except the deceased, which in any manner or degree contributed to the last sad and mournful result. At this place the track was slightly descending, and the two cars moved forward by their own weight and the momentum given them by the push of the engine. The engine did not follow them. While the cars were thus in motion, the deceased passed along on the south side of them, to the front end of them, and climbed upon the front end of the forward car and stood there near the brake and rode there until he nearly reached the third car, when he jumped off the car on which he was riding, on the south side thereof, and passed around in front of it and between it and the third car, for the purpose of coupling the two cars together. He made the attempt to couple them, and in doing so stooped down for the purpose of avoiding all danger from the projecting timbers. But he did not stoop quite low enough. If he had stooped six inches lower, and probably less, he would have been perfectly safe, but he miscalculated, and the projecting timbers struck the back part of his head and crushed it so badly that he soon died.

We do not think that the defendant was guilty of negligence in ordering the deceased to couple the cars, or that the deceased was in attempting to couple them; and this whether the parties knew the exact condition of the cars or not. Cars in the condition in which these cars were could easily be coupled in safety, provided the person coupling them knew their condition and exercised proper care and skill. These very cars, while in the same condition, and only two or three hours after the accident occurred, were coupled together in safety by the defendant's other brakeman, and by yard switchman O. C. Nichols. And during the time that the deceased was in the employ of the defendant, cars in the same condition in which these cars were were frequently received by the

defendant and coupled and uncoupled in safety. Even the deceased himself had previously and frequently coupled and uncoupled such cars. But if it was negligence for the defendant to order the deceased to couple said cars in the condition they were, then it was also negligence for the deceased to attempt to couple them in that condition, provided he knew their exact condition; and if the deceased was negligent in this respect, then of course the plaintiff cannot recover. And we think the deceased must have known the condition of the cars. Indeed, he could not well have avoided knowing their condition, if he kept his eyes open and used them. And his actions in stooping as he did, in attempting to make the coupling, would indicate that he knew how the cars were loaded. The circumstances proved on the trial of the case would seem to indicate more strongly that the deceased knew how the cars were loaded, than they do that any other servant or agent of the defendant knew the same; and still it seems to be admitted that the defendant, through its servants and agents, did know how the cars were loaded. The forty-third finding of the jury, heretofore quoted, states that the deceased knew the condition of the cars, and how they were loaded. But for the purposes of the case, we may suppose that the deceased did not in fact know at any time how the cars were loaded, and still it does not follow that the defendant was guilty of negligence in ordering the deceased to couple the cars. It was not the first time that cars had been received in the yard loaded in the manner in which these cars were loaded. It was not the first time that the deceased had been called upon to couple such cars. And he was not called upon in this instance to couple them in the dark. But cars had been frequently received in the yard loaded as these cars were loaded; and the deceased had frequently coupled such cars; and he was called upon in this instance to couple the cars in broad daylight. The only thing that might even be suggested as being in the way, was, that it was raining; but there is no pretense that the rain obstructed the vision of any one to any considerable extent. The defendant had a right

to believe that the deceased would use his eyes, and his best judgment; that he would exercise all proper care and caution and skill, and that he would couple the cars in safety. He had previously had much experience in these matters. The defendant could not have anticipated that the deceased would fail to see how the cars were loaded; it could not have anticipated that he would fail to use proper care and skill and caution in coupling them; and it could not have anticipated that he would fail to couple them, or that he would be injured in attempting to do so. If this had been the first time that cars had been received in the yard loaded in the manner in which these cars were loaded, or if the deceased had been a new man in the yard, or inexperienced; or if it had been in the *night-time* that the coupling was to be done, as was the case in *Hamilton v. The DesMoines Valley Rld. Co.*, 36 Iowa, 32, it might then, and probably would have been negligence for the defendant to order the deceased to make the coupling, without first explaining to him the condition of the loads and all the dangers connected with the act of making such a coupling. And even then, after making such explanations, it might still have been negligence if the deceased had been inexperienced, and if the defendant knew it.

In connection with this case, we would refer to the following cases as having some application: *Flanagan v. C. & N. W. Rld. Co.*, (Wis. Sup. Ct.,) 7 N. W. Rep. 203; 50 and 51 Wis., and also a decision of the same case, 45 Wis. 98; *Hughes v. Winona &c. Rld. Co.*, (Minn. Sup. Ct., Sept. Term, 1880;) *Kroy v. C. R. I. & P. Rld. Co.*, 32 Iowa, 357; *Pennsylvania Co. v. Hankey*, 93 Ill. 580; *Williams v. A. T. & S. Rld. Co.*, 22 Kas. 117, 120.

The court below gave the following among other instructions to the jury:

"Although Peter Plunkett may have been guilty of misconduct or negligence which contributed remotely to the injury, yet if the misconduct, mismanagement or negligence of the defendant, its agents or employés, was the immediate cause of the injury, and if with the exercise of reasonable prudence and care on the part of defendant the injury might have been

prevented, then it, the defendant, would.be still liable for the injury."

This instruction was misleading and erroneous. If the deceased, Peter Plunkett, was guilty of negligence at all, his negligence was clearly and necessarily direct and proximate, and not remote or far removed from the injury. It was certainly as near to the injury as was that of the defendant. His negligence, if he was negligent at all, was in not observing the manner in which the cars were loaded, or in not stooping quite low enough in attempting to make the coupling; while the defendant's negligence, if the defendant was negligent at all, was in ordering and permitting the deceased to make the coupling. Indeed, the court in other instructions seems to have placed the negligence of the defendant further back even than we have placed it. The court speaks of "the prior negligence of the defendant," and would seem to place this prior negligence as far back as the reception of the cars.

We think the court below also erred in refusing to give certain instructions asked for by the defendant. These instructions asked for, though in various forms, were in substance, that if the deceased knew all the circumstances, and with his eyes open attempted voluntarily to make the coupling, or if, in other words (and these words are ours), he was guilty of negligence proximately contributing to the injury, the plaintiff could not recover. The court refused these instructions as asked, but gave them adding these words: "*Unless the prior negligence of the defendant unnecessarily created the danger*, or unless by reason of the negligence of the defendant, and while the deceased was in the exercise of ordinary care, he received the injuries complained of." In one instance, where the instruction asked for contained the word "negligence," without any qualifying words, the court added the following words: "If such negligence of the deceased proximately contributed to the injury complained of."

The court refused to give other instructions which we think might also have properly been given.

We do not think it is necessary to extend this opinion any

further.   Upon the facts of the case, we do not think that the plaintiff is entitled to recover.   The ruling of the court below upon the demurrer to the plaintiff's evidence is not however assigned for error in this court, and hence we cannot consider that ruling.   And although we can say that many of the special findings of the jury against the defendant are mere general conclusions drawn by the jury, and generally incorrectly drawn, from other more specific findings, or from the facts found and stated in these other more specific findings, and therefore that such general conclusions, or general special findings, (if we may be allowed the expression,) need not be considered, but may be wholly ignored and disregarded; yet we cannot say that all the special findings made by the jury against the defendant are of this same character, or that they may be treated in this same manner.   And hence we cannot say that such of the special findings as may not be rejected or disregarded will support or authorize a judgment in favor of the defendant.   And construing the findings of jury in this manner, while we cannot order a judgment to be rendered upon them in favor of the defendant, yet we can say that several of them, together with the general verdict of the jury, are against the evidence, and ought to have been set aside upon the motion which was made by the defendant to set them aside and for a new trial.   We think the court below erred in overruling the defendant's motion for a new trial.

The judgment of the court below will be reversed, and the cause remanded for a new trial.

All the Justices concurring.