| 101 | 1 |
|---|---|
| 139 | 188 |

| 101 | 1 |
|---|---|
| 144 | 357 |

| 101 | 1 |
|---|---|
| 171 | 602 |

| 101 | 1 |
|---|---|
| 201 | 556 |
| 201 | 557 |

## EASTERN DISTRICT—PHILADELPHIA, 1882.

## Northern Central Railway Company *versus* Husson.

·1. A., a servant of a railway company, while engaged in his ordinary occupation of coupling cars, was caught by the head between the ends of certain bridge irons projecting from the cars and was so crushed to death. It was customary upon said railroad and upon other roads to load bridge irons in the above manner, and A. had full knowledge of this fact, and also that the cars were so loaded upon the particular occasion. The regulations of the company required its servants in coupling to stoop below the body of the car. A. had been for some time in the service of the company and knew of this regulation. He had, in addition, been specially warned on the day in question to observe it. Had he done so, he would, like other servants engaged in coupling other cars on the same train, have done so with safety. In an action by A.'s widow and minor children against the railroad company to recover damages for his death, the court instructed the jury that, if they believed that the deceased was subjected to such extraordinary risk as the company could have avoided, the company was liable. But if the risk was an ordinary one and the deceased failed to take ordinary care, the company was not liable. *Held*, that this was error; that there was no evidence that the risk run by deceased was extraordinary in its nature, and that therefore it was error to submit that question to the jury.

2. *Semble*, further, that the deceased was guilty of such lack of ordinary care in the above case as to preclude recovery.

3. A venire facias de novo was subsequently awarded in the above case, notwithstanding the expression of opinion on the part of the court contained in the preceding clause of this syllabus.

5 OUTERBRIDGE.—1

May 18th and 19th 1882.  Before MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.  SHARSWOOD, C. J., absent.

ERROR to the Court of Common Pleas of 'York county : of January Term 1882, No. 398.

Case, by Lizzie Husson, widow of John Husson, deceased, and William E. Husson et al., minor children of said John Husson, deceased, by their mother and next friend, the said Lizzie Husson, against the Northern Central Railway Company, to recover damages for the death of the said John Husson, caused as alleged by the negligence of the defendant.  Plea, not guilty.

On the trial, before GIBSON, A. L. J., the facts appeared to be as follows :  On the morning of July 14th 1880, John Husson, an employé of the company defendant, while engaged in coupling cars on a work train, was killed by having his head caught and crushed between the ends of certain bridge irons, which projected beyond the ends of the gondola cars on which they were loaded.  He had been employed by the company for similar work at different times, during the preceding two years, and on the day of the accident he was detailed by the conductor of the train to couple cars, at his own request.  There was evidence that the regulations of the company, which were known to the deceased, required persons in coupling cars to stoop, and to make the coupling from beneath by reaching up.  The conductor of the train testified that he gave similar instructions to the deceased as to the mode of coupling, and that if he had complied with them, the accident would not have happened as it did.

The bridge irons were loaded on four gondola cars of the Pennsylvania Railroad Company at some point west of Pittsburgh, in such a manner that when the bumpers of the cars were together the space between the ends of the bridge irons was about five inches.  This mode of loading such freight was not unusual, and the loaded cars had passed inspection at previous points of their route by inspectors of both the Pennsylvania Railroad Co., and of the company defendant.  The cars, so loaded, were received by the company defendant at Marysville, and at the time of the accident an engine with two of the cars backed very slowly up to the other two, which were standing at rest.  Husson walked by the end of the moving cars, as they approached the others, and could have seen the manner in which they were loaded.  As they came together Husson, in making the coupling, was killed as above described.  The cars were, about ten minutes later, coupled in safety by the conductor of the train.

The defendant presented the following points :

1. That the fact, if proved to the satisfaction of the jury, that John Husson came to his death, because the bridge irons of

bridge No. 84 on defendant's railway, were so loaded as to project over and beyond the platforms of the cars which the said John Husson was engaged in coupling, does not justify the jury in finding a verdict of damages in favor of the plaintiff—and their verdict must be for the defendant.

Answer.   This point is refused.

2.   That the evidence in the cause shows beyond question : that the cars on which the bridge irons were loaded had been duly inspected by competent inspectors, and that it was frequently the case that railroad iron, bridge irons and lumber were transported over the defendant's road loaded in the same manner in which the bridge irons for said bridge No. 84 were loaded, and were transported in safety—that cars so loaded could be coupled in safety by a careful person—that said John Husson had voluntarily taken upon himself the duty of coupling cars on the train of which said cars were a part, and said cars so loaded were safely coupled by other persons, and therefore the plaintiffs are not entitled to recover, and the verdict of the jury must be for the defendants.

Answer.   This point is refused.

3.   That the evidence in the case being that the said cars were duly inspected, and were not defective, and were received, as they had been loaded, from the Pennsylvania Railroad Company—that the loading had not shifted, and that the cars had been safely coupled after the death of John Husson and taken on to their place of destination, the plaintiff cannot recover in this case, and the verdict of the jury must be for the defendant.

Answer.   This point is refused.

4.   That the uncontradicted evidence in the case establishes the fact that the proximate cause of the injury to deceased was not the loading of the cars with the bridge irons in the manner described by the witnesses, but the neglect of the deceased, in coupling the cars, to stoop low enough to place his head below the bottom of the cars and the loading, and therefore the verdict of the jury must be for the defendant.

Answer.   This point is refused.

5.   That John Husson, in undertaking to couple the cars loaded with bridge irons, as described in the evidence, without stooping and placing himself in a position below the bottom of the cars and the loading thereon, as required by the regulations of the company and the directions given to him by Samuel Gaul and J. P. Madsen, the conductor and flagman of the train, as stated in the evidence, was himself guilty of contributory negligence, and the verdict of the jury must be for the defendant.

Answer.   This point is refused.

[Northern Central Railway Co. *v.* Husson.]

9. That under all the evidence in the case, the verdict of the jury must be rendered in favor of the defendant.

Answer.    This point is refused.

The court charged the jury, inter alia, as follows :—

"In this case the act performed by the deceased employé. namely, coupling of cars, was an ordinary one in the performance of his duties, but in doing it, he was killed outright. And the question is, was there extraordinary risk or want of ordinary care? What was the cause of this fatality, and whose fault was it ? . . . .

"Conductors and employés of the defendant company generally have testified that instructions were given to the men how to couple cars, and illustrations were given of the manner of doing it, by stooping or crouching down and reaching under the dead-wood, and taking hold of the link, and entering it, the pin having been previously fixed so that the jar of the cars meeting would cause it to drop in its place. You will judge from the evidence how closely the deceased complied with these instructions. According to the testimony of Heinniger, the pin was fixed so as to fall into its place. He stepped one foot over the rail, stooped, reached under with his left hand for the link and entered it to make the coupling. According to the testimony of Heinniger, he stooped, and indeed, from the peculiar construction of the cars as testified to, you will say whether or not he was not obliged to stoop ; for he did actually make the coupling, and if he had not stooped, according to the evidence of Mr. Stacks and others, he would have had his arm caught by the dead wood, or other part of the machinery. And it was also testified to by the employés of the company [that these instructions as to the coupling of cars were given with regard to the construction of the cars and danger of injury to the hand and arm, and not to avoid projecting loads.] A large number of employés, or former employés of the company, have testified that cars with projecting loads frequently pass over the road, and are handled and coupled together with safety ; that such cars may be coupled together with safety, and that in their opinion, cars loaded as these were with bridge irons, with the limited space of five inches between them, could be coupled with safety, by the exercise of ordinary care and judgment.

"You will weigh this evidence with the other evidence in the cause, and say whether under all the facts and circumstances of the accident, the deceased had any reason to know from observation or otherwise that these cars were loaded so closely together, or so low down, as that a stooping or crouching of three or four inches, more or less, was necessary to save his life ; or [if he was obliged to crouch in the manner necessary

for his safety, it is or is not extraordinary care, and whether or not he was subjected to an extraordinary risk, which ordinary care and judgment could not avoid, and which the company might and could have provided against, or furnish safeguards for.]

"If you believe that the deceased was, under the circumstances of this case, subjected to such extraordinary risk, which the company could have avoided, the company is liable.

"But if you believe it was an ordinary risk, and that the deceased did not take ordinary care, in other words, was careless, in the performance of the act which resulted in his death, the company is not liable."

Verdict for the plaintiff for $4,500, and judgment thereon, whereupon the defendant took this writ of error, assigning for error the refusal of their points, and the portions of the charge above included within brackets.

*Hay* and *McVeagh* (*Cochran* with them), for the plaintiff in error.—There was no evidence of negligence by the defendant, which caused the injury, and the court should have withdrawn the case from the jury and directed a verdict for the defendant: Day *v.* Toledo, C. S. & D. R. R., 42 Mich. 523; s. c. 2 Amer. & Eng. R. W. Cas. 126; Atchison, Topeka & Santa Fe R. R. *v.* Plunkett, 2 Amer. & Eng. R. W. Cas. 128; Phil. & Read. R. R. Co. *v.* Schertle, 1 Out. 450; Mansfield Coal & Coke Co. *v.* McEnery, 8 W. N. C. 81; Frazier *v.* Penna. R. R. Co., 2 Wr. 104; Phila. & R. R. R. Co. *v.* Heil, 5 W. N. C. 91; Same *v.* Yerger, 23 P. F. S. 121; Clark *v.* P. & R. R. R., 5 W. N. C. 119; Pa. R. R. *v.* Fries, 5 W. N. C. 545; Lehigh Val. R. R. *v.* Jones, 5 Norris 432; Mich. Cent. R. R. *v.* Smithson, 1 Amer. & Eng. R. W. Cas. 101.

*H. L. Fisher*, for the defendant in error.—The only cases where the court may nonsuit or direct a verdict for defendant, are those where the precise measure of duty is defined, and there is no evidence of failure to comply with such duty. Where, however, the measure of duty varies, where a higher degree of care is demanded under some circumstances than under others, where both the duty and the extent of performance are to be ascertained as facts, a jury alone can determine what is negligence and whether it has been proved: McCully *v.* Clarke, 4 Wr. 406. In the present case neither the standard of duty by the employer in loading cars with projecting bridge irons, nor the standard of care by the employé in coupling such cars, was defined or determinate; but each depended upon circumstances, and it would therefore have been error for the court to hold, as matter of law, that there was or was not either

negligence or contributory negligence per se : Penna. Canal Co. *v.* Bentley, 16 P. F. S. 33 ; Penna. R. R. Co. *v.* Barnett, 9 P. F. S. 259 ; Johnson *v.* Bruner, 11 P. F. S. 58 ; Catawissa R. R. Co. *v.* Armstrong, 2 P. F. S. 282 ; Penna. R. R. Co. *v.* Righter, 2 Amer. & Eng. R. W. Cas. 225.

Mr. Justice GREEN delivered the opinion of the court, October 2d 1882.

The chief difficulty we encounter in this case is in discovering any evidence of negligence on the part of the defendant, such as would subject it to liability for the injury in question. The deceased, John Husson, was an employé of the defendant, whose duty it was, amongst other things, to couple cars, at the time and place of the accident. While in the performance of this duty, his head was caught between the projecting ends of certain bridge irons, loaded upon the cars he was coupling, in consequence of which he was killed. It is not claimed that there was any defect in the road bed, or in the cars, or in the coupling apparatus. The injury was not the result of any defect in any of the appliances furnished by the defendant. On the contrary, it was the result of the manner in which the act of coupling was performed. The same cars with the same loading upon them, were, immediately after the accident, successfully coupled by another person, in perfect safety. The only difference in the two acts of coupling was in the manner in which they were respectively done. Husson's head was raised high enough to be caught by material loaded on top of the cars, and Gaul, who made the second coupling, kept his head below the material and was not caught. Husson's head was above the level of the floor of the car, or it would not have been caught. The act of coupling was necessarily to be performed below the bottom of the cars, as the apparatus by which it was to be done was there located. It was testified by a number of witnesses, and contradicted by none, that in order to make the coupling properly and with safety, the head of the coupler must be below the car. Common prudence would seem to indicate the necessity of such a precaution, and the mere fact and character of the accident would appear to demonstrate that it was due to a want of ordinary care by the deceased. But, however that may be, we are unable to discover anywhere in the testimony, the slightest evidence of negligence on the part of the defendant. The case was left to the jury, by the learned judge of the court below, on the question of extraordinary risk to the deceased on the part of the defendant, and ordinary care by the deceased. Thus in the charge the court said : " If you believe that the deceased was, under the circumstances of this case, subjected to such extraordinary risk which

the company could have avoided, the company is liable. But if you believe it was an ordinary risk, and that the deceased did not take ordinary care, in other words, was careless, in the performance of the act which resulted in his death, the company is not liable." We cannot agree that the risk to which an employer subjects his employee suffices to impose liability upon the former, as being extraordinary in character, merely because the injury in a particular case might possibly have been prevented by some different device. Almost all accidents could be avoided if the especial manner of their occurrence could be foreseen. Nor can we assent to the idea that it requires a combination of ordinary risk on the part of the employer and want of ordinary care on the part of the employee to relieve the employer from liability. If the risk is an ordinary one the employer is not liable even if the employee did use ordinary care. In all such cases the risk of injury is one of the hazards which the employee assumes when he engages in the service to which it is incident. This has always been the law.

There can be no doubt that the coupling of railway cars is a hazardous business, and requires the exercise of a commensurate degree of care on the part of those who engage in it. But it by no means follows that because of an accident to such an employee while performing his duty the employer is liable simply for the reason that the particular accident might have been prevented by some special device or precaution not in common use.

So far as this branch of the case is concerned, and without reference to the question of ordinary care by the deceased, the case resolves itself into the inquiry whether the risk which occasioned the injury was of an extraordinary and unusual character; in other words, a risk not ordinarily incident to the employment in which the deceased was engaged.

This is a question of fact, to be illustrated by testimony. Had there been testimony in the case tending to establish the proposition that the risk was of such a character, the submission of it, and of the question, to the jury, could not have been complained of. We have read the whole of the testimony with great care and are constrained to say that we cannot find any evidence, which proves, or tends to prove, that the risk in question was of an unusual or extraordinary character. But one of the plaintiff's witnesses was interrogated upon this subject—Wm. Henningen—and he testified that it was a matter of frequent occurrence to have cars loaded with material projecting beyond the bumpers, on the defendant's road, and at the yard where the accident happened. He also said that the cars thus loaded were coupled with safety, and that he never knew of an accident in

coupling or uncoupling cars loaded in this manner except in this case. Another of the plaintiff's witnesses—Jas. McCleary—testifies that he was the engineer on the train when the accident occurred, that he backed up the cars very gently and cautiously to have the coupling made, and that in a few minutes after the accident the cars were successfully and safely coupled by Samuel Gaul. Being subsequently called by the defendant he testified that cars loaded as these were could be coupled in safety by a person using ordinary care, that it was a common and usual thing for the defendant to receive and handle cars loaded with materials extending beyond the ends of the cars, and that he had frequently seen them coupled in safety. No other witness for the plaintiffs was examined, or delivered any testimony in relation to this subject, although it was certainly a part of the duty of the plaintiffs to affirmatively establish that the loading of cars in the manner complained of was an unusual occurrence, which created an extraordinary risk.

On the part of the defendant numerous witnesses were examined who testified that it was a matter of constant occurrence to have cars loaded as they were, and that they could be coupled with entire safety by a person exercising ordinary care and prudence. All of these witnesses were men engaged on railroads, many of them in the practice of coupling cars for a number of years, and they were uniform in their testimony that the loading of cars with material projecting beyond the ends of the cars was a common and usual practice, and that the coupling of such cars could be and was constantly done with safety with the exercise of ordinary care. Sixteen witnesses for the defendant and one for the plaintiffs concurred in this testimony, and not one on either side testified to the contrary. In this condition of the record, we are of opinion that it was error to submit to the jury the question of negligence on the part of the defendant.

There was no evidence that the method of loading the cars in question was an unusual occurrence, and no proof that the risk resulting therefrom was an extraordinary risk. It is manifestly apparent, from the entire body of the testimony, that the risk under consideration was one of the ordinary risks of the business in which the deceased was engaged, and hence there was no liability for an injury resulting from it.

In Patterson *v.* Pittsburg & Connellsville R. R. Co., 26 P. F. S. we said, on p. 393, "It is true the master is not responsible for accidents occurring to his servant from the ordinary risks and dangers which are incident to the business in which he is engaged; for in such case the contract is presumed to be made with reference to such risks." The same doctrine was repeated in Pittsb. & Conn. R. R. Co. *v.* Sentmeyer, 11 Norr. 276, and, in

Baker v. Allegheny Valley R. R. Co., 9 W. N. C., SHARSWOOD, C. J., on p. 338, said, " A servant assumes all the ordinary risks of his employment. He cannot hold the master responsible for an injury which cannot be traced directly to his negligence." The case of Day v. Toledo, Canada Southern & Detroit Railway Co., 42 Mich. Rep. 523 is quite similar to the present. Day sued the company for injuries received in having his fingers caught in coupling cars on a train of which he was brakeman. A car loaded with lumber was to be attached to the train. It was claimed the lumber projected forward more than usual, and that plaintiff's fingers were caught in the coupling-link and hurt. The court took the case from the jury, saying, " The injury was from one of the risks incident to the occupation of the plaintiff, and he knew, better than the conductor or any one else, the precise difficulty to be guarded against." In the case of Atchison, Topeka & Santa Fé R. R. Co. v. Plunkett, decided by the Supreme Court of Kansas, and reported in 2 Amer. & Eng. Railway Cases 128, the circumstances were still more analogous. The cars in that case were loaded with materials which projected beyond the ends of the cars. The person attempting to couple them was caught between the ends of the loading and killed. The action was brought against the company for negligence in causing the death of the decedent.

It was held that it was not negligence for the company to receive and handle cars so loaded, nor to order or permit an employee to attempt to couple them. The court, in delivering the opinion, say : " And the main question is this : in what consisted the negligence (if any there was) which caused the death of Peter Plunkett ? If the defendant was guilty of negligence at all, it must have been in ordering and permitting (through its yard-master, Joseph A. Russell) the deceased to attempt to couple said cars. . . . It cannot be said that the defendant was guilty of negligence (that is, culpable negligence) in receiving the cars ; for the mere receipt of them could not by any possibility have injured any one. . . . It is admitted that the deceased knew the condition of the weather, the condition of the ground, the condition of the track, the condition of the cars (not including the manner in which they were loaded), and the manner in which the cars were to be coupled, as well as the defendant or any of its other servants or agents did ; and hence if the defendant was guilty of negligence in any of these respects, the deceased must also have been guilty of negligence in at least as high a degree as the defendant, and, therefore, in either case, that is, whether (in any of these respects) there was any negligence or not, the plaintiff cannot recover. . . . Cars in the condition these were could only be coupled in safety

provided the person coupling them knew their condition and exercised proper care and skill.    These very cars while in the same condition, and only two or three hours after the accident occurred, were coupled together in safety by the defendant's other brakeman and yard switchman, O. C. Nichols. . . . The defendant had a right to believe that the deceased would use his eyes and his best judgment, that he would exercise all proper care and caution and skill, and that he would couple the cars in safety."    There is much force in these observations, and they seem to be quite applicable to the case we are considering. Husson had been in the employ of the defendant between one and two years; he was in the habit of coupling cars, and it was part of his duty to do so ; the accident occurred in broad daylight ; one of the cars was standing still, and the other was moved very slowly up to it—Husson walked by the side of the one in motion and could see the condition of the loading.    If it was manifestly unsafe to attempt to couple the cars in that condition he should not have done so.    That it could apparently and really be done in safety was conclusively proved by its being so done a few moments later.    It is beyond question that the accident only happened because the deceased failed to keep his head at least as low as the floor of the car.    This was an omission which was the fault of the deceased exclusively, and in such circumstances it is difficult to understand how the defendant can be held responsible without uprooting the most familiar principles of the law.    Samuel Gaul, the conductor of the train on which the deceased was engaged, testified that he had frequently instructed Husson to couple from underneath the car whenever any loading projected beyond the end of the car, and it was also testified by several witnesses that in no circumstances should a coupling be made in an erect position.    Madsen, another conductor of a work train, testified that he also had instructed Husson that he should always stoop below the bottom of the car in making the coupling; and both he and Henninger, a plaintiff's witness, testified that Madsen, just before the accident, notified all the men, including Husson, that the cars were loaded over the ends, and that they must be careful in walking over them.    None of the foregoing testimony was contradicted, and although we have not rested the decision of the case upon it, we know of no reason why it should not have exercised a controlling influence both with the court and jury.    Upon the whole case, we think the defendant's ninth point should have been affirmed, and the jury directed to render a verdict for the defendant.

                                        Judgment reversed.


December 30th 1882.    Per Curiam.    Ordered that a venire facias de novo issue in this case.