[Filed November 30, 1886.]

## FRED SCOTT v. THE OREGON RAILWAY & NAVIGATION COMPANY.

RAILROADS — NEGLIGENCE — CONTRIBUTORY NEGLIGENCE — NONSUIT. — The plaintiff, an experienced switchman and car-coupler, while in the employ of the defendant company, was injured in coupling a car loaded with railroad iron rails, which projected beyond the platform of the car. The plaintiff and his fellow-servants in the defendant's yard each had the right, when a car was received so loaded as to render it dangerous to handle, to report the fact to the foreman of the yard, whose duty it then became to adjust the load so as to render it safe. The latter, at the time of the accident, had uncoupled the car in question from the train in which it had arrived, and sent it to the plaintiff to be coupled to other cars, and though he saw that the rails projected, did not notice that they projected so far as to render the car unsafe to couple ; and there was no other evidence of notice to the defendant or its servants of the dangerous condition of the load. The plaintiff, as the car approached him, observed that the rails projected (as was usually the case) but did not discover that they projected so far as to render them dangerous. *Held :*

That the evidence did not show such freedom from negligence on the part of the plaintiff, nor such negligence on the part of the company, as to render it liable, and that the defendant's motion for a nonsuit should have been granted..

SAME—EXTRA HAZARD.—In this class of cases it is necessary to determine, before a recovery can be had, that the risk imposed by the company upon the employee was of an unusual character ; and where the company adopts a mode of doing a certain kind of business more dangerous than some other mode would be, and its employee, knowing the fact, continues in its employment, and acquiesces in such mode, he cannot, in case of injury, claim that he was exposed to danger of an extroardinary or unusual character.

SAME.—A party has a right to contract to perform any lawful business, however hazardous it may be, and notwithstanding it is rendered more risky than it otherwise would be, by the manner in which the employer conducts it ; and in such case the employee takes the attendant risk.

MULTNOMAH COUNTY.    Defendant appeals.    Reversed.

*C. B. Bellinger*, for Appellant.

*E. C. Bronaugh*, for Respondent.

THAYER, J.—The respondent commenced an action against the appellant, to recover damages for an injury received while in the appellant's employ.    The appellant is a railway corporation, operating a railroad in the State of Oregon, and was incorporated under the laws of the state.    The respondent alleged in his complaint that on the 13th day of July, 1885, he was in the appellant's employ as a switch-tender and car-coupler for hire, at Albina, Multnomah County, Oregon, and so remained in its employ up to the time of the commission of the grievance complained of ; that on the 13th day of July, 1885, the appellant carelessly and negligently received into its custody two certain flat cars loaded with railroad iron rails, which rails were so carelessly and negligently loaded and placed upon said flat cars prior to and at the time of their reception by appellant, that the ends of some of said rails protruded over the draw-bars of each and both of said cars, a distance of two and one-half to three feet, and which thereby greatly increased the danger of coupling either of said cars when it became necessary or proper to couple either of them ; that thereafter, and on the 13th day of July, 1885, the said flat cars, so carelessly and

negligently loaded, in the dangerous and unsafe condition oc-
casioned by said loading, were at Albina, and were by appel-
lant's agent carelessly and negligently detached from a cer-
tain locomotive, and started down an incline toward a certain
box car, and the respondent was directed and required by the
appellant's agent to couple said cars to said box car ; that the
appellant and its proper officers at the time of receiving said
flat cars so loaded, and at the time of the injuries to respond-
ent, had full knowledge of the dangerous and unsafe condition
of said flat cars, owing to their being so negligently loaded,
and of the negligent and careless loading thereof ; that respond-
ent was wholly ignorant of the manner in which they were
loaded, and of the dangerous condition for coupling them in
which they were ; and that in attempting to couple the same
to said box car, as required, and whilst in the exercise of due
caution, or without negligence or fault of respondent, his left
hand was caught between one of said protruding railroad iron
rails and the said box car, and his hand so crushed as to render
amputation of the second and third fingers of the left hand
necessary, and the same were amputated.   These allegations
were followed by the usual allegations of sickness and suffer-
ing, the deprivation of the use of the other fingers upon said
hand, the inability to pursue his calling as a switchman and
car-coupler, and an allegation that by reason of the said inju-
ries he had been damaged in the sum of $7,000.

The appellant controverted the allegations of carelessness
and negligence upon its part in the affair, and imputed the in-
jury to the carelessness of the respondent, and tendered an issue
upon all the allegations touching the liability.  The action was
tried by a jury, and the following evidence and facts were sub-
mitted to them by the respective parties, and proceedings had
on the trial.

The plaintiff, to sustain the issues on his part, offered him-
self as a witness, and being first duly sworn, testified in sub-
stance as follows :   " My name is Fred Scott, and am plaintiff
in this action.   My business is switchman and car-coupler ; I
have followed that business for fifteen years.   I have been in

the defendant's employ for two and a half years in Albina, Oregon, as car-coupler and switchman, and was at work for the defendant in that capacity on the day and at the time I received the injury to my hand. We commenced work at seven o'clock on that morning, and not long after we began we went with the switch engine up to East Portland to meet the paymaster, and brought him down to Albina. The morning was clear and pleasant. We were making up a transfer train for the Northern Pacific Railroad; we were making up this train on track number nine. There were three or four loaded box cars standing on track number nine. The cars we used to make up the transfer train had come over the defendant's railroad from Wallula, and were standing on the track where they were left when they came in. The cars were cut off from those trains and hauled out by the switch engine, and then kicked back upon the switch track, where they were to be used. A box car with air brakes had been kicked back by the switch engine on track number eight, and it was moving slowly along, and I was following it up to encourage it along. I looked and saw three flat cars loaded with railroad iron rails had been kicked upon number nine, and were coming back towards the box cars standing on that track, and were moving faster than the car I was following. These flat cars were to be coupled to the box cars on number nine, to make the transfer train. I had walked about a car length to get from number eight to where I coupled the flats to the box car. I saw the flat cars were loaded with railroad iron rails, and that they projected over the end of the car, as railroad iron mostly does. I could not see how far, as they were coming towards me, but I did not think they stuck over that far. When I first saw them, the flat cars were about three car lengths from me. One cannot stand up and couple flat cars loaded with iron. It is liable to shift its place, slide forward, and crush him. I stooped down to couple the cars, so as to get my body and head below the projecting iron and out of the way of it. As the car came back the iron passed over my head; it struck my hat and pushed it down over my eyes, and I took my left hand to re-

place my hat.   As soon as I did that I put up my left hand and took hold of the round iron step near the bottom of the end of the box car to which the others were to be coupled, and while there I felt a cold sensation in my left hand, and when I got out after coupling the cars I found my second and third fingers on my left hand had been caught between the end of the rail and the step I had hold of, and crushed.   I had to take hold of this step.   There was nothing else I could take hold of to steady myself by, when I stooped to make the coupling. There was no stay chains nor any brake at the end of the box car.   I could not safely make the coupling without stooping down, and I had to hold on to something to steady myself as I stooped.   If there had been any truck chains or any brake chains that I could have held on to, I need not have taken hold of the iron rod on the end of the box car ; in that case I would not have been hurt.   These cars usually have stay chains and brakes, but this car did not have them.   I had been coupling these flat cars loaded with railroad iron before this, and had probably coupled twenty cars loaded with such rails within the preceding three or four weeks.   The iron all projected over the end of the car, more or less.   The flat cars came back against the box cars standing on the track, and forced the box cars back a few steps, and I had to walk two or three feet after they struck, to keep up with them and make the coupling.   I think the round or step on the box car was pretty low down.   I think it was about six inches above the bottom of the car.   When you couple a flat car loaded with these iron rails you must take care of yourself.   There are no men in the yard whose business it is to look after the loading of the iron.   I have on one or two occasions assisted the conductor of the switch engine, and other men working in the yard with me, to fix the loads of railroad iron.   We did it by placing a piece of lumber against the end of the box car, and then having the switch engine push the flat car back until the rails struck the timber, in this way pushing the iron back even with the end of the flat car.   I do not know how I could make a living now.   I could not do anything.   I could not set a brake.   I would not risk

my life with that hand.  My wages were from $60 to $75 per month.  Ed. Magoon is general yard master.  He was not at the office that morning.  He employed and discharged the men.  I never noticed these cars before I coupled them.  I looked at them after I got my hand hurt.  There is danger to every man's hand who couples cars."

It appears, also, from the bill of exceptions that the railroad iron rails upon said car, by which plaintiff was hurt, projected for a distance of two and a half or three feet over and beyond the end of the car where plaintiff attempted to make the coupling ; that iron rails loaded upon flat cars frequently protrude beyond the end of the car as much as from eighteen to twenty inches, and plaintiff and said other witnesses had frequently coupled such other cars, but had never coupled cars where the iron projected as far as this iron did by which plaintiff was hurt ; that the space between the cars when coupled and relaxed is about two and one-half feet, but that the draw bars or bumpers contain strong springs, which at the moment of meeting, when the cars collide to be coupled, give way, and allow the cars to approach within about two feet of each other, and then rebound and throw the cars apart to about the distance of two and one-half feet ; that the end of the iron rails by which plaintiff was hurt struck the end of the box car at the point where the plaintiff's hand was resting, with such force as to bend and crush the iron rod or step to which plaintiff was holding up against the end of the box car, mashing the end of the car, and so mutilating plaintiff's hand as to necessitate the amputation of the two middle fingers close up to his hand, rendering the little finger stiff, so that it cannot be bent, and is useless, and the front or index finger can scarcely be bent sufficiently to touch the end of the thumb. Medical witnesses testified that such anchylosis or stiffness of said two remaining fingers is permanent..

Plaintiff also testified that he knew nothing of the condition of the loading upon said flat car by which he was injured until after he was hurt.  That he had not been on the part of the yard where said flat car was left the evening before, after

said car was brought into the yard, and had not had any opportunity of observing how it was loaded until after he was hurt by it.

Plaintiff testified that in stooping into a squatting position, so as to couple the flat cars so loaded, the coupler had to look out that his head is low enough to allow the projecting rails to pass over it; and that it is customary to grasp the stay-chain or break-beam of the stationary car, in order to assist the coupler to move along with the cars when the collision occurs, so as to prevent being run over by the moving cars.

Plaintiff also testified that he had no other vocation than that of a car-coupler, which he has followed ever since he was grown, and that he cannot now safely follow that vocation without risking his life, for want of use of the injured hand, with which to grasp to some support to help himself along, and prevent being run over by the cars at the time of coupling them. He also testified that in following his vocation in defendant's yard, he was under the authority and control of the foreman of the switch engine, and worked where and as he was directed by such foreman to work; and that said foreman had authority to report him, plaintiff, to the yard-master, if plaintiff failed or refused to obey said foreman's orders; and that said foreman was in charge of the engine that moved back toward plaintiff, to be coupled by him, the flat car by which plaintiff was injured. But the plaintiff received no direction to couple the particular cars when he was injured.

Plaintiff also testified that the danger to a man's hand in coupling cars arises from the liability, if he is not careful, of having his hand caught between the bumpers when inserting the coupling link.

The plaintiff also offered Frank Bigelow as a witness in his behalf, who, upon being duly sworn, testified in substance that he was foreman of the switch engine upon the Albina yard at the time of the accident; that his gang consisted of himself, the plaintiff, and —— Emerick; that they all worked together; that each man knew what he had to do, and went to work, doing it without speaking to one another; that he

did various kinds of work—sometimes coupled cars, and sometimes attended to the switch; that if a car came into the yard to be handled, so loaded that it was dangerous to the employees to handle it, an employee was at liberty to report the fact to the yard-master, and refuse to handle the car until it was properly loaded; that the men in his gang could either report the fact directly to the yard-master or to him, the witness, who would do so; that if his attention was called to a car so loaded, he would order it side-tracked, and report the fact to the yard-master; that the flat car in question had come in the evening before, over the Northern Pacific lines, loaded in the same condition as it was at the time of the accident, coupled to a box car at the same end coupled by the plaintiff at the time of the injury; that the witness uncoupled said flat car from the box car without difficulty; that he did not notice that the rails projected so as to make it unsafe or difficult to couple or uncouple the same; that there was two or three inches space between the rails and the box car to which it was coupled at the time he uncoupled said car.

The plaintiff having rested his cause, the defendant moved for a nonsuit, upon the ground that there was no evidence sufficient to be submitted to the jury; which motion was denied by the court, to which ruling defendant duly excepted.

The defendant, to sustain the issues on his part, offered Ed. Magoon as a witness, who being duly sworn, testified that prior to and at the time of the accident he was general yard-master at the company's yard at Albina, where the accident occurred; that he employed and discharged the men working upon the yard, including switchmen, brakemen, and car-couplers; that no one else had authority to do so; that if cars were improperly loaded, or loaded so as to make it unsafe for those employed in handling them, any of the employees had a right to report the fact to him, when it was usual to order it side-tracked until the load could be adjusted into proper position; that no complaint was made to him at any time that the flat cars in question were not properly loaded; that it was not the duty of witness to examine with reference to the way cars are loaded, unless they are reported to him.

There was no evidence in the case tending to prove that any one had made any complaint, or given any notice that the car in question was improperly loaded, or any other evidence than that herein set out, tending to show the relation in which plaintiff stood to the other employees of defendant; nor was there any other evidence introduced on the trial tending to prove negligence on the part of the defendant than that herein set out, nor other evidence tending to show that plaintiff was acting under direction or orders of any one at the time of the injury ; nor was there any evidence herein contained of injury, or tending to prove damages sustained by the plaintiff.

After the evidence was closed, the court proceeded to instruct the jury, and among other instructions gave the following :

2. " A railroad company agrees, when it employs a man to work for it, that it will furnish him with reasonable, safe and convenient implements, machinery and instrumentalities, with which to perform his duties. If he fails in this, and the employee is injured on that account, and without fault of his own, the company is liable."

4. " It is the duty of the railroad company to take proper care that railroad iron loaded upon the flat cars does not project so far beyond the end of its cars as unreasonably and unnecessarily to endanger the lives and limbs of its employees engaged in coupling such cars, who have nothing to do with loading them, and have not ample opportunity to judge of such danger before attempting to couple them."

5. " If a railroad company makes it the duty of a switchforeman upon its yard to see that railroad iron, arriving upon the yard in flat cars, does not project so far beyond the end of the cars that they cannot be safely and conveniently handled and coupled, and another employee of the company, whose business it is to couple cars upon the yard, is placed by the company under the authority and subject to the orders of such foreman, if the foreman neglect that duty, and thereby the employee engaged in coupling such cars is injured, without contributory negligence on his part, such negligence of the foreman is the negligence of the company, for which it is liable to the party injured."

These several instructions were excepted to at the time given, and are now relied on as error.   Also the following one :

17.   "They, the defendants, are just as responsible, if the cars were brought there from the Northern Pacific Railroad, and arrived there improperly loaded, as though they had loaded them themselves.   It is the duty of the company to provide for the safety of the employees.   They cannot escape the duty by showing that they have employed no one to look after the safety of employees."

The court, in its instructions to the jury in regard to the damages, instructed them that they might take into consideration loss of time of the respondent on account of the injury, physical suffering he had endured, mental suffering, pain suffered hereafter, and suffering on account of being maimed. The appellant's counsel claims that this instruction includes too many items of damage.   After the court had given the instructions to the jury, the appellant's counsel prayed certain instructions, including the following :

" If the plaintiff had the same or equal means of knowledge as the defendant, or its superintendent or vice-principal, and saw, or was in such a position that he could have seen, if he had used ordinary care to look, the condition of the iron rails as they protruded over the car at the time he was about to couple the flat car containing the rails to the box car ; and if he knew, or was in a position to know, that it was dangerous to make the coupling—if it was dangerous—and might, if he chose, have refused to do it; if he then voluntarily did the work, he took the risk upon himself; and if he received any injury and was damaged, he cannot recover for it in this action ; and your verdict should be for the defendant."

" The fact, if it is a fact, that the box car was not provided with safety chains, brake-bars, or other means of holding to by persons engaged in coupling cars, with which cars are usually provided, cannot be considered by you in determining whether the flat car in question was properly loaded."

The cause having been submitted to the jury, they returned a verdict for the respondent for $6,500 ; upon which the judgment appealed from was entered.

I have set out the bill of exceptions in full, for the reason that the denial of the motion for a nonsuit is made a ground of error. That ruling, and giving and refusing the instructions as before mentioned, are the only questions presented for consideration. The first matter to be considered is, whether the evidence, as shown by the bill of exceptions, proved a cause sufficient to be submitted to the jury. It would not certainly be, unless it tended to prove that the appellant was guilty of negligence, in the affair in which the respondent was injured, and that such negligence was the immediate and proximate cause of the injury; and does not show that the respondent was guilty of negligence contributing to it. The respondent was not required to show affirmatively, in order to recover, that he was free from negligence upon his part; yet if it appear from his own proof, offered for the purpose of establishing the appellant's negligence, that he was also guilty of negligence, but for which the injury would not have been received, it would be fatal to his recovery. (*Grant* v. *Baker*, 12 Or. 329.)

The only negligence that could have been chargeable to the appellant, was in attempting to transfer the flat cars without adjusting their freight. It certainly was not responsible for the manner in which they had been loaded; nor was it in fault in receiving those cars into its custody, even if the ends of some of the iron rails did protrude over the draw-bars of the cars. It was not unlawful or negligent on the part of the appellant to receive them in that condition, as it may have contracts with the Northern Pacific Rail Road Co., or whatever company it received them from, that it would receive them in the condition in which they might arrive. The respondent could not justly complain of that. The appellant's fault, if it committed any fault, was in undertaking to transfer these cars without first putting the iron rails in such a position as not to enhance the danger in coupling them with other cars; and the charge in the complaint, of negligence upon the part of the railroad company in the affair, must be confined to this single act.

Nor is the question of the obligation of a railroad company to furnish its employees with " reasonable, safe and convenient implements, machinery and instrumentalities with which

to perform their duties," involved in the case. It was not made by the pleadings, nor does it arise upon the evidence; and cannot, as I am able to discover, have any application whatever to the case. The respondent did not use articles included under such designation in the performance of his duties. He was a switchman and car-coupler; and, so far as appears, did not use implements and appliances in that employment aside from the coupling apparatus. When he engaged in the company's service in that capacity, he assumed all the ordinary risk incident thereto; and unless the company subjected him to unnecessary danger it was not liable. This was the gist of the action, and he had no right to have his case submitted to the jury without first proving that the company did subject him to extraordinary risks in the affair, and that his injuries were received as the direct consequence thereof. In order, therefore, to determine whether the respondent proved a case sufficient to be submitted to the jury, we must ascertain whether the evidence was sufficient to establish the fact that the appellant imposed upon him such a risk.

According to the evidence, as will be seen from its inspection, the appellant's business of coupling cars and making up trains, at the Albina yard, where the accident occurred, was at the time of it in charge of Frank Bigelow, the respondent, and one Emerick, the former of whom was foreman of the gang, as they were termed, and had the general direction of the work; but that each had the right, when a car came into the yard to be handled, so loaded that it was dangerous for the employees to handle it, to report the fact to the yard master, and refuse to handle it until the load was adjusted; that Bigelow, the foreman, on the morning of the accident, uncoupled the car in question from a box car, and sent it and two other flat cars along one of the tracks of the yard toward some box cars standing upon that track, to which they were to be coupled; that the said flat cars were uncoupled from the box car without difficulty, and that the foreman did not notice that the rails projected so as to make it unsafe to couple or to uncouple it; that the respondent was about a car length from the place of

the accident, when he saw the three flat cars coming towards the box cars to which they were to be coupled; that he saw that the flat cars were loaded with railroad iron rails, which projected over the end of the car; but could not see how far they did project, and did not think that they projected as far as they did; that railroad iron rails mostly project over the end of the car, and they are liable to shift their place and slide forward in coupling the car upon which they are loaded; that the respondent was an experienced switchman and car-coupler at the time of the accident, and had been engaged in coupling cars for the appellant for two and a half years in Albina when the accident occurred; and that he coupled the car when he received the injury without having any direction to couple the particular car. These facts appear from the respondent's testimony and from the witnesses called by him; and it is from these and from some incidental facts that the carelessness and negligence of the appellant must be inferred, if at all.

In *Day* v. *Toledo, C. S. & Detroit Ry. Co.*, 42 Mich. 523, an experienced brakeman was ordered by the conductor to attach a car loaded with lumber, which projected forward, the plaintiff claimed, more than usual, and which compelled the brakeman to stoop in making the coupling. In doing so he delayed a little, and his fingers were caught in the coupling link and hurt. In an action by the brakeman against the company for the injury, the Supreme Court of that state held that the trial court very properly took the case from the jury. Campbell, J., in delivering the opinion of the court, said: " That the injury was from one of the risks incident to the occupation of plaintiff, and he knew, better than the conductor or any one else, the precise difficulty to be guarded against. The conductor was not shown in any way to have been in fault, and it would be absurd to hold a corporation for imputed negligence, when no person except the plaintiff could have been actually guilty of it. In *Atchison, T. & S. F. R. Co.* v. *Plunkett, Adm'r*, 25 Kan. 188, the Supreme Court of that state held that when a railroad company is in the habit of receiving from other railroads cars loaded with timbers which project over the

end of the cars so as to make it dangerous for any one except a careful, skillful and prudent person to attempt to couple the cars together, it is not negligence for the railroad company to order and permit such a person, who has been in the employ of the railroad company doing that kind of business for about five months, to attempt to make such a coupling where the attempt is to be made in broad daylight, although it may be raining at the time. That was in a case of a brakeman who, in attempting to couple cars loaded with timbers which were received from another railroad company, was killed; and the action was brought against the company in whose employ he was at the time, by his administrator. The case seems to cover every question raised here, and the above conclusion was reached.

Another case very similar in principle will be found in *Flannagan* v. *The Chicago & N. W. Railway Co.*, 50 Wis. 462. There the plaintiff, who was a brakeman in the employ of the company, was required to get upon a train of cars while in motion and uncouple it, so that the cars might pass down into the yard. The car which he was required to get upon had a broken jaw-brace, as it is termed, which is a piece of hard timber so adjusted as to extend from the back to the forward wheel of the car, and intended for the use of the brakemen, to place their feet upon, in order to get upon top of the car when it is in motion. In that case the Supreme Court of Wisconsin held, in an action by the brakeman to recover damages from the company, that the fact that the foreman of the gang in which the brakeman was engaged directed him, after turning a switch, to mount the second car from the engine, for the purpose of aiding in sending the unloaded car down to the repair shops, and the brakeman was injured in mounting said car in consequence of its having the broken jaw-brace, were not sufficient to warrant the jury in finding the company guilty of negligence, when there was no evidence that said foreman was charged with the business of inspecting the cars, or knew of the defect in said car, or had any better means of knowledge than the plaintiff. The respondent's counsel attempts to distinguish this case from the one above referred to, by claiming

that Bigelow, the foreman of respondent's gang, must have known that the iron rails projected so far over the end of the car, that it rendered it unnecessarily dangerous to couple it. He, having uncoupled the cars on the morning of the accident, had an opportunity to discover the condition the load was in. The witness was called by the respondent, and I cannot see that his testimony is at all inconsistent with the surroundings of the affair. The car in question had come across the appellant's road from Wallula, and the iron could not have certainly extended so as to go against the car to which it was coupled. It is not at all reasonable to suppose that the company's officers would have permitted that condition of things, as it would have been likely to have seriously damaged the end of box car. Besides, the respondent himself testified that iron rails of the kind in question were liable to shift their place, and slide forward, while the car upon which they are loaded is being coupled. I do not think that a jury would have any right to disregard such testimony as that of Bigelow, given under the circumstances that was, and have inferred a direct contrary fact from that which he stated. He said that he " uncoupled the car from the box car to which it had been attached, without difficulty ; that he did not notice that the rails projected so as to make it unsafe or difficult to couple or to uncouple it ; that there were two or three inches space between the end of the rails and the box car to which it was attached when he uncoupled it." There is nothing contradictory of this testimony, except the fact that when the respondent coupled the car to the box car, the ends of the iron rails went against the end of the box car ; but if the evidence of the respondent is to be accredited, that might have occurred from the sliding forward of the iron when the two cars came together at the time they were coupled. I do not believe the evidence justifies a conclusion that Bigelow was guilty of negligence in the particular claimed ; and it is not, therefore, important to determine whether he was at the time the injury was received vice principal, or an ordinary employee, in the matter of transferring the flat cars. It may be claimed that there was evidence upon the point suf-

ficient to be submitted to the jury. That would be so, if there were any evidence tending to prove the fact. Where, however, it is a mere matter of conjecture as to whether the fact exists or not, the jury have nothing to do with it ; nor can negligence be imputed by respondent to the appellant, in consequence of its receiving and transferring the flat cars, although the iron rails loaded thereon extended over the ends thereof, where it is shown, as in this case, to have been a usual occurrence. The .appellant had been accustomed to recive cars so loaded, and to transfer them in that condition. The respondent had acquiesced in the mode. He frequently, as he testified, coupled them to other cars when the railroad iron rails extended over the ends of the cars coupled, though not so far, he said, as in the particular case in question. He knew, however, that they extended over in that case.

This question was determined in *North Central Ry. Co.* v. *Husson*, 101 Pa. St. 1. There a fatal injury occurred to a car-coupler, while engaged in his ordinary occupation of coupling cars. His head was caught between the ends of certain bridge irons projecting from the cars, and he was crushed to death. It was customary upon said railroad and upon other roads, to load bridge iron in that way, and the car-coupler had full knowledge of the fact, and also that the cars were so loaded upon the particular occasion. The court held in that case that there was no evidence that the risk run by the deceased was extraordinary in its nature, and that, therefore, it was error to submit that question to the jury.

In this class of cases it is necessary to determine, before a recovery can be had, that the risk imposed by the company upon the employee was of an unusual character ; and where a railroad company adopts a mode of doing a certain kind of business more dangerous in its character than some other mode would be, and the employee engages in its service knowing the fact, or when under an engagement of service continues on in the employment and acquiesces in such mode, he cannot claim, in case of an injury, that he was exposed to danger of an extraordinary or unusual character. He assumes in such

case the risk to which the more dangerous mode subjects him. As the appellant, therefore, was in the habit of receiving and transfering such railroad iron, so loaded, and the respondent continued in its employ in the capacity in which he was engaged, and attended to the coupling of the cars so loaded, he cannot recover for a personal injury which would probably have been obviated had not the iron extended over the end of the car.    A party has a right to contract to perform any lawful business, however hazardous it may be, and notwithstanding it is rendered more risky than it otherwise would be, in consequence of the manner in which the employer conducts it. In such case the employee assumes the attendant risk. (*Kroy, Adm'r,* v. *The Chicago, R. I. & P. R. R. Co.,* 32 Iowa, 357.)

In the case referred to in 101 Pa. St., the court said that " there could be no doubt but that the coupling of railway cars was a hazardous business, and required the exercise of a consummate degree of care on the part of those who engaged in it.    But it by no means followed that, because of an accident to such an employee while performing his duty, the employer was liable, simply for the reason that the particular accident might have been prevented by some special device or precaution not in common use."    The employee should be advised of the danger to which he was exposed when it was not open to full view, and should not be exposed to others not ordinarily incident to the employment.    Where, however, the employee voluntarily subjects himself to danger, though he does so without carelessness or breach of duty, he cannot recover on account of an injury received thereby. (*Pittsburg & C. R. Co.* v. *Sentmeyer,* 92 Pa. St. 276.)

In the trial of this class of cases the law applicable thereto should be closely observed.    Railroad companies should be made aware of the grounds of their liability to their employees, and the latter made to understand the responsibility they are under.    The business is usually attended with dangers to the lives and safety of those employed to conduct it, and the companies should be vigilant in guarding against their exposure to

unnecessary risks; while the employees on their part should refrain from committing reckless or careless acts. If the former understood that they would be compelled to respond in damages for neglecting to observe suitable precautionary measures for the security of the latter, and the latter in turn understood that they could not recover for injuries where they themselves had been careless in the affair in which it occurred, there would be fewer casualties attending the business than there would be if the one had no well defined idea of their liability in the premises, and the other depended upon the sympathies of courts and juries to obtain compensation for their loss and damage. The law, unfortunately, can only lay down general rules for the guidance of the two classes. It can declare, generally, the obligations they are under; but its application can only be made to the facts and circumstances of the particular case, and it is often rendered more uncertain by a failure upon the part of the court administering it, to require parties in the pleadings to point out specifically the acts of negligence complained of, and to confine the investigation strictly to such charges. Too frequently in such cases the whole matter is shoved off on to the jury, and they left under vague general instructions as to the law, which they usually overlook, and proceed to determine the case in accordance with their own caprices. We have examined many authorities upon the subject, with a view of ascertaining the correct rule in such cases. We find that they differ materially, some of them holding railroad companies to a very strict duty, and others inclined to charge employees with high responsibility, in the affair in which the injury was received. The late case of *Kelly, Adm'r,* v. *Abbot,* 63 Wis. 307, belongs to the latter class. There a brakeman upon the Wisconsin Central R. R., whose duty was to couple freight cars to the caboose, was killed by being crushed between the caboose and a foreign freight car which he was attempting to couple to the caboose. There was a difference in the height of the coupling irons upon the two cars; those on the freight being so much higher than those on

the caboose that they passed over and under each other, and by reason of which the unfortunate brakeman was caught between the platform of the one and the end of the other and killed; and the court held that the negligence, if any, which caused the accident, was that of the deceased, or of his fellow servants, and that the company was not liable. The case was on demurrer to the complaint, in which the facts that the deceased was and had been for a long time a brakeman on one of the freight trains of the said railroad, which ran between Fond Du Lac and Menasha, and of his duty of coupling freight cars to the caboose were set out; also that on the day that he lost his life the train was run out on a side-track at Fond Du Lac, for the purpose of coupling the freight car, which belonged to the Chicago, M. & St. Paul Railway Company, to the caboose at the rear end of said train ; and also the condition of the coupling irons and a description of the accident ; and in which it was alleged that it was the duty of the railroad company to provide cars of suitable couplings and adapted to each other ; and the negligence of the company in not doing so, and in allowing such freight car of another company to be brought upon the track to be so coupled ; also, that the deceased was careful and prudent in his effort to make such coupling. These facts the court held were not sufficient to constitute a cause of action; and gave for reasons that the want of adaptation of the two cars to each other (in all respects properly constructed in themselves) was the only defect ; and that the furnishing of them by the company, and requiring them to be so coupled, constituted the only negligence of the company complained of ; that there was no reason stated why the deceased did not or could not have discovered such apparent want of adaptation of coupling irons of the caboose and car; that the affair presumably took place in the day time, as it was not stated to have occurred in the night; that the coupling irons were so widely mismatched would seem to have been as observable and readily seen as the entire absence of coupling irons, one or both ; that it was not to be inferred that it was the only instance when the cars of different roads brought together to be coupled were so mis-

matched, but that the contrary might rather be inferred. The decision, in short, was based upon the grounds that the brakeman had as good an opportunity to know the condition of the coupling irons as the company had ; that the duty of the company to know their condition was not absolute, and it was not presumed to know of it as a matter of law ; and that the liability of a railway company in such cases did not depend upon its general and absolute duty to furnish safe and proper machinery and other appliances with which its employees might work, but upon its knowledge, actual or presumed, that such coupling appliances would not properly fit and connect with each other ; that it did not appear from the complaint that the company did not have in their employ at the time suitable persons to make inspection of all such foreign cars, and ascertain their fitness to go into trains ; and it was presumed that such persons were so employed, and that other employees of the company caused the foreign car in that case to be upon the side-track, ready to be coupled to the caboose ; and that if there was any negligence on the part of any one in not ascertaining beforehand that these couplings would not meet, it must have been the negligence of the co-employees and fellow-servants of the deceased, for which the company was not liable.

I cite this case, not in support of the views I have expressed regarding the obligations of railroad companies in such cases, but to disapprove of many of the principles it announces. I believe it altogether too extreme upon the subject. I think the complaint stated a cause of action, and that the company could not defeat it without showing that the brakeman had contracted to serve the company, in view of such risk. If the company had been accustomed to receive and transfer cars of another company under such conditions, and the brakeman been in the habit of coupling them, it might have been an excuse ; but that fact should have appeared specially, and not been left to inference ; and then it would look like an engagement to be sacrificed. I do not see how cars with coupling irons adjusted as they were could be attached without an injury to the car-coupler; and to require a brakeman to attempt the per-

formance of so hazardous an act would, *prima facie*, to my thinking, be gross recklessness. It is said, in the opinion of the court in that case, that the brakeman could see the danger and refuse to perform the service; but it is well understood that railroad employees are expected to obey the orders of the company about as promptly as soldiers are those of a superior officer, and do about as little thinking. Decisions of that character, to my mind, go far towards legalizing manslaughter. They are opposed in principle directly to that in *Gottlieb* v. *N. Y., L. E. & W. R. R. Co.*, 100 N. Y. 462, which holds that such company is bound to inspect cars received under such circumstances, and, if found defective, either to remedy the defect or refuse to receive them. This seems more in accordance with humane principles; and the decision, to my notion, furnishes a more salutary precedent than the other class of cases.

The respondent's counsel claims that this case comes within the principles laid down in *Gottlieb* v. *N. Y., L. E. & W. R. R. Co.*, *supra*. If I thought it did, I should be in favor of sustaining the ruling of the court upon the motion for a nonsuit; but it seems to me that the appellant had done everything regarding the inspection of the flat cars that could reasonably be required. It had not caused these cars to be inspected, it is true, but had left that matter to the gang to which the respondent belonged, and to the yardmaster. Either of said members had authority to examine those cars, and if he deemed any one of them unsafe to couple, in consequence of the iron loaded thereon extending too far over the end of the car, to report the fact to the yardmaster, in which case the car would be side-tracked, and, if found necessary, the load adjusted. This made the respondent, to some extent at least, an inspector, and if he undertook to couple a car so loaded it was his own fault. At the time he received the injury, he saw that the iron rails projected over the end of the car. He knew that they were liable to shift their places and slide forward, when the collision took place preparatory to the coupling, and he was at full liberty to run the risk of being injured, or refuse to attach the

car until the load was put in place. He chose the former course, and I am unable to discover wherein the appellant was to blame in the matter. If an inspector of a car himself were to be injured from a defect he had overlooked, or had neglected his duty to inspect it at all, no one would pretend that he could maintain a claim against the company for such injury; and, as I view it, the respondent occupies the same position, in effect. Under this view, the judgment appealed from must be reversed, and this case remanded to the court below, with directions to enter a judgment of nonsuit against the respondent.

Strahan, J., concurs.

Lord, C. J., dissenting.—This was an action to recover for personal injuries sustained by the plaintiff while in the employ of the defendant as a car-coupler and switchman, resulting from the alleged negligence of the defendant, in allowing to be handled a car received from another road, alleged to be improperly and dangerously loaded. The car thus received, and which occasioned the injury, was loaded with railroad iron, which projected beyond the platform of the car. The evidence shows—all of which is included in the record—that the foreman of the yard uncoupled this car, to which was attached other cars loaded with railroad iron, and with his engine, as it is phrased, "kicked" it back to the place where plaintiff was working, to be coupled to another train of cars, and in so doing observed that the iron rails protruded within two or three inches of the car from which he uncoupled it. From the position of the plaintiff, the car approached him endwise, and he had not seen it until it was moving back to where it was to be coupled. He stooped down to get under the projecting rails, and at the same time, to steady himself, caught hold with his left hand the round iron step near the bottom of the end of the box car. While in this position he felt a cold sensation in his left hand—his second and third fingers had been crushed by the projecting rails of iron coming against the iron step of which he had laid hold. His testimony is: "I had to take

hold of this step.   There was nothing else I could take hold of to steady myself by, when I stooped to make the coupling. There was no stay-chain or any brake at the end of the box car. I could not safely make the coupling without stooping down, and I had to hold on to something to steady myself as I stooped. If there had been any truck-chains or brake-chains that I could have held on to, I need not have taken hold of the iron rod on the end of the box car ; in that case I would not have been hurt."   The evidence further shows that he was an experienced switchman and car-coupler, and fully understood the hazard of his employment, and the necessity of exercising care in the coupling of cars under such circumstances; and that he had coupled flat cars loaded with railroad iron before this, and had " probably coupled twenty cars loaded with such rails within the preceding three or four weeks."

Upon this state of facts, did the handling of this car, thus received and loaded, create or impose any extraordinary risk upon the defendant in his employment ?   The general rule is, that when a servant enters the employment of his master, he thereby assumes all the risks reasonably to be anticipated as incident to his line of duty.   These risks, it is said, he is supposed to have in mind when he engages in the service, and that his compensation is stipulated accordingly.   But these are necessarily limited to such risks as can ordinarily be foreseen from the natural scope of his employment, and do not include such as involve peculiar danger or extraordinary risks.   " A servant," says Sharswood, C. J., "assumes all the ordinary risks of his employment.   He cannot hold the master responsible for an injury which cannot be traced directly to his negligence." (*Baker* v. *A. V. R. Co.*, 95 Pa. St. 215 ; *Patterson* v. *P. & R. R. Co.*, 76 Pa. St. 393.)   It results, then, if the risk is ordinary and incident to the employment, and not peculiar and extraordinary, although the servant may have used ordinary care, the master is not liable for the injury.   The reason is, that the risk of such injury is incident to the line of duty in his employment, and one of the hazards which the servant assumes when he undertakes such employment.   The in-

jury complained of was not the result of any defect in the coupling apparatus, or in the cars; only, it is claimed that the condition of the load, as described, rendered the duty the plaintiff had to perform more hazardous, and created an extraordinary risk. Upon the issue tried, the position of the parties, then, is thus: The plaintiff claims that the injury was caused by the negligence of the defendant in handling the car, loaded in the manner described, and in attempting to transport it in a train in that condition; while the defendant insists that the injury was caused by the plaintiff's own negligence, and that his want of care contributed to that result.

The coupling of railroad cars is always a dangerous employment, and requires the exercise of care commensurate in degree with the nature of such employment. When cars are loaded with material which projects beyond the car, it may be more hazardous to couple them than when not loaded; yet there are cases in the books which show, and the evidence of the plaintiff confirms, that the act of coupling, in such cases, can be performed with safety. All that is required is to exercise that degree of care commensurate with the duty to be performed. The plaintiff knew, as he testified, that he must stoop—keep below the projecting material loaded on the floor of the cars—in order to make the coupling properly and with safety. He further testified that such material was liable to shift its place and slide forward when the cars came in contact, showing that he fully understood the hazards incident to his employment, and the necessity of keeping his person below it and out of its range, to avoid liability to accident or injury. His own, as well as other evidence, shows that it was a common occurrence for the defendant to receive cars loaded with railroad iron extending beyond the end of the cars, and that he himself had frequently coupled them in safety. But this has no reference to the receiving of cars loaded with such projecting material as had been shifted in travel, and rendered extra hazardous to handle without being rearranged, or the load righted. To this point and in this view, the case is relieved of all difficulty, and in principle is covered by the cases of

*Atch., T. & Santa Fe R. Co.* v. *Plunkett*, 25 Kan. 188, and *Northern C. R. Co.* v. *Husson*, 101 Pa. St. 1.

But there is a phase of this case that remains yet to be considered. The defendant had devolved upon the foreman the authority and duty, when it came to his knowledge that a car loaded with iron had so shifted its position as to be dangerous, to side-track it, or order it side-tracked, and report the fact to the yardmaster. The object of this was to have the load righted before it was handled. Now the foreman, when he uncoupled the car, and before he " kicked " it back, noticed that the iron rails with which the car was loaded projected within two or three inches of the car from which he uncoupled it. We must suppose that he knew that cars loaded with such material, and in the shifted condition of that load, were not only liable to slide forward, but that in the relaxing of the spring when the car came into contact, the projecting rails would be thrown forward with the car, and be liable to break or smash the box car to which it was to be coupled; which, in fact, it did do, and at the same time flattened the iron step and crushed the hand of the plaintiff. Such being his authority in the premises, and the fact of the condition of that load coming immediately under his observation, was it not his plain duty to have side-tracked the car, in order to have its load, which had been shifted in travel, rearranged or righted, to avoid the increased liability to accident, before he kicked the car back to be handled by the coupler ; or, at least, before doing so, notified the coupler of the condition of the load ? It will hardly do to assume that cars thus loaded, liable to punch holes, or smash in box cars, or do other injury to person and property under such circumstances, was a usual or common way of transporting such material. Are we authorized to say, upon such a state of facts, that there is no proof tending to show that cars with loaded material in that condition was an unusual occurrence, and which created an extraordinary risk? On the other hand, the evidence is that the plaintiff did not see this car until it was coming towards him endwise—that he could see that the rails were projecting, but he could not determine from his

position to what extent ; that he stooped—knew that he must keep out of the way of the projecting rails, but to steady himself and do his work with safety, it was necessary to have something to hold on to ; that the box car, as is usual with such cars, had no hand-hold for that purpose, nor stay-chains or brakes at its end which he could take hold of, and that he had to take hold of the iron step to steady himself when he stooped, to perform the act of coupling in safety. In view of these facts, can it be said that the plaintiff did not exercise ordinary care, and conduct himself with common prudence ? It is of great importance, and especially in regard to railroad trains, that both master and servant should be held to the fullest measure of duty ; and to relax the rules by which either is to be governed, would be detrimental to the public interests.