## TUCKER *v.* NORTHERN TERMINAL COMPANY.

[68 Pac. 426 ; 11 Am. Neg. Rep. 629.]

PLEADING CONTRIBUTORY NEGLIGENCE AS A DEFENSE.

1. In actions for personal injuries it is not necessary to allege or prove lack of contributory negligence by the plaintiff : *Johnston* v. *Oregon S. L. Ry. Co.* 23 Or. 94, cited.

RAILROADS—DEATH WHILE COUPLING CARS—ASSUMED RISK.

2. A railroad employe was used to coupling flat cars loaded with iron rails, which usually shift in transit. In an action for his death, it appeared that, while thus employed, a flat car was "kicked" toward a loaded car, and, while endeavoring to couple them, he was caught between the projecting rails and the moving car. No one saw the accident, but it occurred before sunset, and his view of the cars was unobstructed, though what his position was before the cars came together was not shown. It was apparent that he must have stooped to avoid the danger at the time of the accident. *Held,* that it was an ordinary risk of his employment, which he had assumed.

Care Required of Railroad Terminal Company.

3. A terminal company engaged in receiving and switching cars from railroad companies is not bound to the same degree of care for the safety of its employes as a regular railroad company engaged in general transportation business.

From Multnomah:   Alfred F. Sears, Jr., Judge.

Action by Jane Tucker, administratrix of James A. Tucker, deceased, against the Northern Pacific Terminal Co.   Plaintiff was nonsuited, and she appeals.                    Affirmed.

For appellant there was a brief over the name of *Watson & Beckman,* with an oral argument by *Mr. Edward B. Watson.*

For respondent there was a brief over the name of *Dolph, Mallory, Simon & Gearin,* with an oral argument by *Mr. Rufus Mallory.*

Mr. Justice Moore delivered the opinion.

This is an action by Jane Tucker, as administratrix of the estate of James A. Tucker, deceased, against the Northern Pacific Terminal Co., a corporation, to recover damages for a personal injury sustained by her intestate, causing his death. The plaintiff alleges, in substance, that the defendant is in possession of a railroad terminal yard in Portland, Oregon, and engaged, among other things, in repairing freight cars, readjusting their loads, and in making up trains; that on July 10, 1899, it received from the Southern Pacific Co., a freight car in a damaged condition loaded with iron rails, which had shifted, so that their ends extended over the end of the car from one to three feet; that the company repaired the car but did not rearrange its load, and four days later, knowing the condition of the car and its load, and that any attempt to couple it to another car would expose a switchman to unnecessary danger, carelessly ordered James A. Tucker, a car coupler and switchman in its employ, to make such coupling; that, not knowing, and unable to ascertain, the distance which the rails extended, unconscious of the danger to which he was

exposed, and in pursuance of the command, he undertook to make the coupling, and while thus engaged, and in the exercise of due care, his head was caught between the projecting rail and an iron guard upon the rear end of the approaching car, and so crushed that he died in a few minutes; that the injury was caused by the negligence of the defendant, without any fault or want of due care, skill, prudence, or caution on the part of the deceased.

The answer after denying the material allegations of the complaint alleges, in effect, among other things, that it was the business of the defendant to receive cars from railroads terminating in its yard to be made up into trains; that cars loaded with iron rails are frequently received by it, and inspected by persons appointed for that purpose by the railroad companies whose lines of railway connect with its yard, over whose acts the defendant has no control, whose duty it is to inspect the loads upon cars so received by the defendant, and, if found to be in an unsafe or dangerous condition, the inspector should refuse to accept such car, until the load thereon was properly adjusted by the railroad company delivering it; that, while James A. Tucker was employed as a switchman and car coupler, cars loaded with iron rails were frequently received, and in most cases the ends of the rails extended more or less past the end of the car, and such projection is not an unsafe method of loading, if the extended rails do not come in contact with the next car in the train, which fact Tucker well knew, and he was in the habit of coupling cars with loads in substantially the same condition as the car in question; that such cars can ·be safely coupled by stooping below the projecting rails, which fact he well knew, and that neither he nor any other car coupler was required to make such coupling, if in his judgment he could not do so with safety; that some of the rails on this car extended over the end, but none more than 24 inches, and in such condition the car was not dangerous, and was accepted by the inspector for the Northern Pacific Railway Co., over whose lines it was to be transported; that when a car approaching the car so loaded had reached a point near enough to be

coupled to it, Tucker stooped to make the coupling, but carelessly and negligently failed to stoop low enough to permit the rails to pass over his head, and when the cars came together he sustained the injury causing his death, which is the same injury and death mentioned in the complaint; that the injury was caused solely by the negligence and want of attention on the part of Tucker, and without any fault or negligence of the defendant. The averments of new matter in the answer having been put in issue by the reply, the plaintiff introduced her testimony and rested, whereupon the court granted a judgment of nonsuit, and she appeals.

The question to be considered is whether the testimony introduced at the trial, aided by presumptions based thereon and deducible inferences, was sufficient to require the submission of the cause to the jury. An examination of the bill of exceptions shows that Tucker, at the time of his death, was twenty-three years old, and for more than a year prior thereto had been employed by the defendant in its yard as a switchman and car coupler; that the defendant owns in Portland, Oregon, a terminal yard, consisting of a series of railway and side tracks, with which are connected lines of railway, operated respectively by the Northern Pacific Railway Co., the Oregon Railway & Navigation Co., and the Southern Pacific Co., and is engaged in receiving into its yard from said railway companies cars which are uncoupled, and when they are returned or hauled over either of the other lines of railway are made up into trains by the defendant's servants; that on July 10, 1899, the defendant received from the Southern Pacific Co. a flat car, 30 feet in length, loaded with iron rails of the same length, which car was to be shipped over the line of the Northern Pacific Railway Co. This car, being out of order when so received, was repaired by the defendant, and set out on one of its side tracks, to be made up into a train for its destination. A flat car, with an automatic coupler, was "kicked" down, to be coupled to the loaded car, which had a common drawhead. No witness was called who saw Tucker when he attempted to make the coupling, so that the manner of his injury is to be

inferred from the circumstances. The side track at the scene of the accident runs north and south, at the west side of which his body was found, with the head crushed. In the patent drawhead a coupling link was found fastened, the other end of which was entered in the common drawhead, the pin in the latter having fallen over, and one of the iron rails, extending over the end of the car 29 inches, came within about three or four inches of an iron cleat surrounding a stake pocket on the end of the car "kicked" down, and blood was discovered upon the end of the projecting rail, and upon this clamp, thus tending to show that the near approach of these blood-marked objects probably caused his death. The testimony also shows that railroad rails shipped on cars usually shift in transit, so that they extend over the end of the car 18 inches or more, and that the only safe way in which a car in this condition can be coupled is by the switchman stooping, so that the rails may pass over his head. The intestate having been killed at about 7 o'clock P. M., before sunset, and at a point where his view of the cars to be coupled was unobstructed, the question is, assuming from a contemplation of the foregoing testimony, which is a fair *resume* of that given at the trial, that the defendant was guilty of negligence in not readjusting the rails, was Tucker also guilty of negligence contributing to his injury, and, if so, was the evidence of his want of care so conclusive that the court could, as a matter of law, take the question from the consideration of the jury?

1. The rule is settled in this state that it is unnecessary for a plaintiff, in a complaint in an action to recover damages for a personal injury, to allege or affirmatively show at the trial that he was free from negligence; but if it should appear from his own proof, offered for the purpose of establishing the defendant's negligence, that he was also guilty of negligence, without which the injury complained of would not have occurred, such proof will defeat a recovery: *Grant* v. *Baker,* 12 Or. 329 (7 Pac. 318) ; *Scott* v. *Oregon Ry. & Nav. Co.* 14 Or. 211 (13 Pac. 98) ; *Johnston* v. *Oregon S. L. Ry. Co.* 23 Or. 94 (31 Pac. 283).

2. The defense of contributory negligence is made upon the theory that, notwithstanding the defendant has been guilty of negligence, the person injured has also been guilty thereof, and, as the law will not measure the degrees of wrong where each party is guilty, the plaintiff cannot recover. The answer denies that the defendant was guilty of any negligence, and avers that the intestate's death was caused by his carelessness and want of attention. It is impossible to say from an inspection of the testimony, or from a consideration of the circumstances attending Tucker's death, whether he had been following the flat car that was ''kicked'' down, or was standing at the loaded car waiting to make the coupling at the instant of contact. If he occupied the latter position, he would undoubtedly have had sufficient time, and, the sun not having set, ample opportunity, to inspect the car near which he was standing, and, having had experience in coupling cars on which the rails had slipped in this manner, he must have known that he could successfully perform the duty required of him only by stooping, so that the rails might pass over his head when he effected the coupling, and, if he failed to bend forward low enough, the fault was his, and necessarily defeats a recovery. It might be inferred, from the fact that the coupling link was found fastened in the automatic coupler, but not pinned in the common drawhead, that Tucker had inserted the link in the approaching car which he was accompanying, and in the hurry incident to the performance of his dangerous work did not see the shifted rails, and was not conscious of his extreme peril until too late to stoop low enough to permit the protruding obstacles to pass over his head. That he was stooping when he sustained the injury is evident from the testimony, which shows that, if he had been standing erect when attempting to make the coupling, the projecting rail would have struck his breast instead of his head. The fact that the coupling link was entered in the common drawhead would seem to refute the inference that he was unconscious of the danger to which he was exposed, for, if he had been following the approaching car until he saw the extended rails, his effort to escape the impend-

ing danger would probably have prevented him from attempting, as he must have done, to enter the link in the common drawhead. Another circumstance that seems irresistibly to lead to the conclusion that Tucker must have thought that he stooped low enough to avoid injury is the fact that the bed of the car loaded with iron rails must have been lower than that of the car to which it 'was to be coupled, for it will be remembered that his head was injured by being between the iron rail and the stake pocket; and, if the cars had been of the same height, the rails would have passed over the deck of the approaching car, so that he may have reasonably supposed, in the hurry of the work, that, his head being below the end of the car that had been "kicked" back, he was out of all danger. Assuming, without deciding, that the defendant was guilty in not readjusting the load, it would seem that the plaintiff's intestate was also guilty of negligence contributing to his injury, in that he did not stoop low enough.

It may be suggested that it was incumbent upon the jury, and not within the province of the court, to deduce inferences of fact from the circumstances attending the injury, in view of which it is deemed proper to consider the question of Tucker's assumption of the risk, in case any error may have occurred in reaching the conclusion that he was guilty of contributory negligence. The plea of an assumption of risk is a defense in which, if the injury results from a peril ordinarily incident to the employment, the question whether the servant was in the execution of due care at the time he sustained the injury is wholly immaterial: *Northern Cent. Ry. Co.* v. *Husson,* 101 Pa. 1 (47 Am. Rep. 690). It is not alleged in the answer that plaintiff's intestate assumed the risk that caused his injury, and such averment is unnecessary, if the hazard was ordinary, for the rule of the common law is that when a servant, of suitable age and sufficient intelligence, enters into the employ of the master, he is presumed to understand, and, therefore, in consideration of the rate of compensation agreed to be paid, voluntarily assumes, all the risks ordinarily incident to the business in which he engages (*Johnston* v. *Oregon*

*S. L. Ry. Co.* 23 Or. 94, 31 Pac. 283; *Brown* v. *Oregon Lum. Co.* 24 Or. 315, 33 Pac. 557; *Snow* v. *Housatanic Ry. Co.* 8 Allen, 441, 85 Am. Dec. 720; *Hare* v. *McIntire,* 82 Me. 240, 19 Atl. 453, 8 L. R. A. 450, 17 Am. St. Rep. 476; *Wonder* v. *Baltimore Ry. Co.* 32 Md. 411, 3 Am. Rep. 143) ; and whenever the law presumes a fact, it is not necessary to aver the same in a pleading: Bliss, Code Plead. (3 ed.) § 175.   The rule appears to be otherwise, however, in respect to extraordinary risks, in which case the servant's assumption thereof, to be available as a waiver, must be affirmatively alleged in the answer: *Mayes* v. *Chicago, R. I. & P. Ry. Co.* 63 Iowa, 562 (14 N. W. 340, 19 N. W. 680) ; *Fisher* v. *Central Lead Co.* 156 Mo. 479 (56 S. W. 1107) ; *Union Stock-Yards* v. *Goodwin,* 57 Neb. 138 (77 N. W. 357) ; *Lloyd* v. *Hanes,* 126 N. C. 359 (35 S. E. 611) ; *Lee* v. *Reliance Mills Co.* 21 R. I. 322 (43 Atl. 536).   ''The waiver of the negligence of the defendant,'' says Mr. Justice BECK, in *Wells* v. *Burlington, C. R. & N. Ry. Co.* 56 Iowa, 520 (9 N. W. 364), ''places the case in the same position as though the defendant had not been negligent; and without the negligence of the defendant there can be no recovery.''   The servant's assumption of extraordinary risks is a waiver in advance of all claims for damage that may arise in consequence of the master's negligence, and, as a plea of such fact admits a right of action in the servant, but seeks to avoid recovery by reason of the waiver, it seems to be necessary to allege such defense, if relied upon.

The important question to be considered is whether the shifting of iron rails in transit, so that they project beyond the end of the car on which they are loaded, creates an extraordinary risk.   ''The ordinary risks of a particular business,'' say Shearman and Redfield in their work on Negligence (5 ed.), § 185, ''are those which are part of the natural and ordinary method of conducting that business, even though they might fairly be called extraordinary with reference to a different business, or a different department of the same business.''   In *Jackson* v. *Missouri Pac. Ry. Co.* 104 Mo. 448 (16 S. W. 413), it was held that when a railroad company is in the habit of re-

ceiving and transporting cars laden with timbers and iron rails projecting over the ends of the cars, the risk arising therefrom is the ordinary one assumed by a brakeman engaged in the company's service. Mr. Justice BLACK, speaking for the court, says: ''The business of a brakeman is beset with many dangers which are incident to his business, and these risks arising from cars loaded with projecting timbers and rails are risks incident to this particular business, and as to that business are not extraordinary.'' In *Northern Cent. Ry. Co.* v. *Husson,* 101 Pa. 1 (47 Am. Rep. 690), a brakeman was killed in coupling cars by having his head crushed between the ends of bridge irons projecting beyond the ends of the cars on which they were loaded, and, it appearing that he was aware of a regulation of the company requiring persons coupling such cars to stoop for that purpose, it was held that the risk run by the brakeman was not extraordinary. In *Atchison, T. & S. F. R. Co.* v. *Plunkett,* 25 Kan. 188, it was held that where a railroad company is in the habit of receiving cars from other roads loaded with timbers projecting over the ends of the cars, so as to make it dangerous for any one except a careful, skillful, and prudent person to attempt to couple the cars together, it is not negligence for the railroad company to order and permit such a person, who has been in the employ of the railroad company doing that kind of business for about five months, to attempt to make such a coupling, where the attempt is made in broad daylight, although it may be raining at the time. In *Boyle* v. *New York, etc. Ry. Co.* 151 Mass. 102 (23 N. E. 827) ; the plaintiff's intestate, in attempting to couple cars, had his head crushed by projecting timber, and, the injury having occurred in daylight, it was held that he assumed the risk, and that no recovery could be had.

In *Day* v. *Toledo, C. S. & D. Ry. Co.* 42 Mich. 523 (4 N. W. 203), a brakeman, in stooping to couple cars, had his fingers injured by the coupling link, caused by lumber projecting beyond the end of the car, and it was held that the injury resulted from one of the risks incident to his occupation, and that no error was committed in taking the case from the jury.

In *Louisville, etc. Ry. Co.* v. *Gower,* 85 Tenn. 465 (3 S. W. 824), a brakeman, in coupling cars having been injured by lumber projecting beyond the end of the car, brought an action against the railway company for the damages sustained, and it was held that the risk, being necessarily incident to the business of railroad transportation, was assumed by him, and that no recovery could be had.   In *Mexican Cent. Ry. Co.* v. *Shean,* 18 S. W. 151, an experienced switchman, having charge of an engine and its movements, undertook, without objection, to couple a flat car, with its load projecting over the end, to a box car, knowing the dangerous way in which it was loaded, and, having been injured in the performance of his duty, he brought an action to recover the damages sustained, but it was held that he had assumed the risk, and could not recover.   For authorities to the effect that a brakeman in coupling cars on which the load projects beyond the end of the car assumes the risk incident to the service, see *Ely* v. *San Antonio, etc. Ry. Co.* 15 Tex. Civ. App. 511 (40 S. W. 174) ; *Brennan* v. *Michigan, etc. Ry. Co.* 93 Mich. 156 (53 N. W. 358) ; *Toledo, etc. Ry. Co.* v. *Black,* 88 Ill. 112; *Scott* v. *Oregon Ry. & Nav. Co.* 14 Or. 211 (13 Pac. 98).   The reason upon which the principle rests that material projecting beyond the end of the car is a risk ordinarily incident to the business of a brakeman is thus succinctly put by Mr. Justice Snodgrass, in *Louisville, etc. Ry. Co.* v. *Gower,* 85 Tenn. 465 (3 S. W. 824), in which he says:  "Lumber of all kinds, iron, steel, and finished structures must often necessarily be transported on cars of shorter length than the material to be transported.   It may not be practicable or proper to solidify the train by loading upon connected cars, and it must, of necessity, result that this loading will project, and still the cars require to be coupled.   To hold that such a service is not to be anticipated by a railroad employe as an occasional, incidental, though extremely hazardous duty to be performed, would be to do so in manifest disregard of the demands of the age upon transportation lines, and their common and well-understood service in conformity to such requirements."

It is contended by plaintiff's counsel that this rule has no application to material which, when carefully loaded, would not extend beyond the end of the car, and that, the car in question being of the same length as the rails which were loaded thereon, no necessity existed for any projection of the rails, and that such extension, caused by the shifting of the rails, was not an ordinary risk incident to the business of coupling cars, and hence the court erred in not submitting the cause to the jury. In *Corbin* v. *Winona, etc. Ry. Co.* 64 Minn. 185 (66 N. W. 271), a brakeman in the defendant's employ having been killed while coupling cars, one of which was loaded with steel rails that projected over the end of the car due to careless loading or resulting from displacement while in transit, the administrator of his estate, brought an action to recover the damages sustained, and, having secured judgment therefor, the company appealed. The evidence showed that the brakeman knew that the rails projected; that he saw the conductor who had charge of the train uncouple the car in question by stooping below the rails, and was cautioned by him to ''look out for that car, as the rails stick over;'' that the deceased stooped and made the coupling, but raised his head a second too soon, and a trifle too high, whereupon he was immediately pinned against the adjoining car by the extended rail. It also appeared that material of this character often shifted in transit, and when it extended so far as to interfere with the adjoining car its transportation became dangerous, and it was the custom to reload the car or to side track it for that purpose; and that, the conductor having knowledge of the condition of the rails on the car, the company had notice thereof, and it was held that the court could not say as a matter of law that the defendant was not negligent in permitting the car to remain in the train, and that the question of the brakeman's contributory negligence was properly submitted to the jury. Mr. Justice Collins, in speaking of the extension of the rails, says: ''It is to be remembered that this is not a case where, from the size or shape of the articles carried, they must of necessity project over one or both ends of a car, as will heavy sticks of tim-

ber, or heavy castings, or threshing machines, but it is a case where the load is capable of being placed so that no part of it will extend beyond the deck of the car; and that, if the ends of the rails do project, it is because of careless loading, or is the result of displacement in transit; and, further, that such displacement is not an uncommon occurrence,—in fact, according to defendant's witnesses, it is to be expected. It is also to be noticed that, according to these same witnesses, whenever such material projected so far as to endanger an adjoining car, it was cus⁺omary to put the rails in place, either by moving them by hand, or by pushing them back, using heavy timbers and a locomotive,—'butting' them, as one witness expressed it.'' In that case no question of assumption of risk was considered, the decision being put upon the alleged negligence of the defendant and the contributory negligence of the plaintiff's intestate.

In *Scott* v. *Oregon Ry. & Nav. Co.* 14 Or. 211 (13 Pac. 98), the plaintiff, a brakeman, having been injured in coupling a car loaded with iron rails that extended over the end of the car, secured a judgment against the defendant for the damages sustained, in reversing which Mr. Justice Thayer, in speaking of the plaintiff's employment as an experienced switchman and car coupler, says: ''When he engaged in the company's service in that capacity, he assumed all the ordinary risks incident thereto; and, unless the company subjected him to unnecessary danger, it was not liable. This was the gist of the action, and he had no right to have his case submitted to the jury without first proving that the company did subject him to extraordinary risks in the affair, and that his injuries were received as the direct consequence thereof.'' The decision, however, seems to rest upon the principle of contributory negligence, the majority of the court holding that, as the plaintiff had the right to inspect the car in question, and to refuse to couple it if he found the load thereon dangerous, and not having reported to the foreman in charge of the defendant's yard the condition of the car, he was not free from negligence, nor was the defendant guilty of such negligence as rendered it liable, and that a judgment of nonsuit should have been given. Mr. Chief

Justice Lord, in a dissenting opinion, intimates that the rails having shifted on the car in transit was an unusual occurrence, and created an extraordinary risk.

3. It will be remembered that the defendant is not engaged in operating a line of railway, but in receiving and switching cars, and in coupling them up into trains. The size of its yard, and the length and number of its tracks, are not disclosed by the evidence; and while the care demanded of it in the performance of its business is commensurate with the danger incurred, the same degree of care cannot, upon principle, be required of it as is exacted of a railway company engaged in general transportation business, in which case its trains are moved upon schedule time necessitating hasty coupling and uncoupling of cars at stations, whereby brakemen have not the opportunity for careful observation of the instrumentalities with which they are engaged, nor the time for deliberate action, which switching in a terminal yard affords. In the latter case, the danger incident to coupling cars evidently being less imminent, what might be considered as an extraordinary risk in the coupling of cars at a way station on the line of railroad, where hasty action on the part of the brakeman is demanded, would not be so regarded in coupling cars in a terminal yard. The evidence shows that iron rails shipped on flat cars usually shift in transit, and that a car upon which they have been displaced in this manner can only be coupled safely by the brakeman stooping below the projecting rails and allowing them to pass over his head when the cars come together. The shifting of the rails being usual, the risk incident to coupling cars on which such load has shifted is ordinary, particularly so in a terminal yard. The plaintiff's intestate was an experienced switchman and car coupler, and that he must have seen the protruding rails and been conscious of the danger to which he was exposed is evident from the location of the injury, which conclusively demonstrates that he was stooping, as necessity demanded, when he attempted to make the coupling. We think, as to the service demanded of him, that the risk was ordinary, and one

which he assumed on entering upon the discharge of his duty, and, this being so, no error was committed in granting the nonsuit. It follows that the judgment is affirmed.

AFFIRMED.