JAMES P. CORBIN, Administrator, v. WINONA & ST. PETER RAIL-
ROAD COMPANY.[1]

February 7, 1896.

Nos. 9734—(198).

### Railway—Injury to Brakeman—Negligence.

*Held*, in an action to recover damages caused by the alleged negligent killing of plaintiff's intestate, a brakeman upon one of defendant's freight trains, while he was coupling a flat car, loaded with rails which projected over the deck of the car, that defendant's negligence in attempting to haul the car in its then condition was for the jury to determine.

### Same—Contributory Negligence.

The law is that there must be a want of ordinary care, under the circumstances of the case, contributing to the injury as an efficient and proximate cause thereof, before contributory negligence can exist. But if the negligence, amounting to the absence of ordinary care, shall contribute, proximately, in any degree, no recovery can be had.

### Same—Question for Jury.

It was also for the jury in this cause to pass upon the question of plaintiff's contributory negligence.

Appeal by defendant from an order of the district court for Lyon county, Webber, J., denying a motion for a new trial, after a verdict in favor of plaintiff for $1,750. Affirmed.

*Brown & Abbott*, for appellant.

*M. E. Mathews*, for respondent.

COLLINS, J.[2] Plaintiff's intestate, his son, aged about 19 years, was killed while in defendant's employ as a brakeman upon one of its freight trains, and, alleging negligence as the cause of the death, plaintiff brought this action to recover damages. A verdict was rendered against defendant, and this appeal is from an order denying its motion for a new trial.

No dispute exists over the main facts. The deceased had been in defendant's employ as a freight brakeman about four months, when killed. On the night of December 21, 1892, he was acting

[1] Reported in 66 N. W. 271. [2] Buck, J., absent, took no part.

as head brakeman upon a freight train going westerly from Waseca, on defendant's road. The engineer, fireman, conductor, rear brakeman, and deceased composed the train crew. A flat car, loaded with steel rails which had been used elsewhere, had been taken up, and were being transported westerly, had been side-tracked the night before at what was known as "Traverse Siding." At this siding there was no depot, nor was there any person in charge. The cause or reason for leaving the car at Traverse was not shown, nor did the testimony disclose its exact condition when it was side-tracked. But the conductor and one brakeman of the train which left it noticed at the time that the ends of several of the rails projected a few inches over the west end of the deck of the car, the result of careless loading, or displacement while in transit (the latter being a common occurrence, according to the testimony of a number of railroad men). Some time during the night first mentioned, the train upon which the deceased, Corbin, was employed, came to Traverse siding. The conductor found the car, and in a box, kept for the purpose, found the way bill which accompanied it. He caused it to be put into his train immediately in rear of a box car destined for Sleepy Eye, about 40 miles west. The train reached this point after daylight, about 7:30 a. m., on December 22, and the conductor then uncoupled the box car, to be left there, from the flat car on which were the rails.

He testified that all of the rails projected more or less over the deck of the car, and that he uncoupled, in the usual and only safe way under such circumstances, by stooping under the rails, pulling the pin, and then backing out without raising his head. He also testified that at this time Corbin stood within a few feet, looking at him. Some two or three cars at the rear of the train were also uncoupled, at a street crossing, so that it was then in three sections. The locomotive was then used in switching and setting out cars billed for Sleepy Eye, for about 40 minutes, and when through with this work, the conductor told Corbin that nothing more was to be done, to couple onto the cars on the main track, and (pointing it out, a few feet distant), "to look out for that car, as the rails stick over." The locomotive, with a few box cars, the first section of the train, was then close by, on a side track. Corbin stepped on the rear car, rode out past the switch,

turned it, and as the section was backed down slowly he walked beside the box car to be coupled onto the flat. At this time the conductor was going to the depot. The rear brakeman stood at the street crossing, waiting for the train to back down so that he might make the coupling there.

The last seen of Corbin alive was when the box car was near the flat and he then stood outside, but close by, the track, giving to the engineer what is known as a "half-car" signal,—that is, a signal that the cars to be coupled are about half the length of a car apart. From the time the locomotive commenced to back down the main track towards the flat, its movements were under Corbin's control, and it was shown that it moved slowly and carefully.

No one saw just how the accident happened. Corbin made the coupling, but did not come out from between the cars. When found, his head was pinioned between the end of the box car and the end of a rail which projected 14 inches beyond the deck of the flat on which the rails were, his face being towards the draw bars. This particular rail was 4 feet 1 inch from the ground, while Corbin was 5 feet 11 inches in height. Counsel for appellant contends that from the evidence it clearly appears that he stooped under the projecting rails, as he should have done to do this particular work, and that while backing out after making the coupling he raised his head too quickly, and in this way was caught. The known facts indicate that this contention is correct, for he could not have reached under the load of rails and have made the coupling without stooping, nor would his head have been caught by the rail, 49 inches from the ground, unless he had been in a stooping position. We accept this as being the manner in which the accident occurred. We also assume that Corbin saw the projecting rails when he stood by and saw the conductor uncouple the flat car from the box car west of it; and also that he understood the conductor's cautioning words about the rails; and, further, that as Corbin walked down towards the flat, and at the time he stooped down to do the coupling, he knew that the rails projected over; and also that he realized the danger of the undertaking. From the evidence, it cannot be said that Corbin did not know or appreciate the risk.

The first question for consideration is whether appellant company was negligent, either in permitting the car to be put into the train at Traverse siding, where it had been side-tracked for about 24 hours, or in allowing it to remain in the train after its condition was seen by the conductor when he uncoupled it from its leader at Sleepy Eye, some 30 minutes before the accident.

It is to be remembered that this was not a case where, from the size or shape of the articles carried, they must of necessity project over one or both ends of a car, as will heavy sticks of timber, or heavy castings, or threshing machines, but it is a case where the load is capable of being placed so that no part of it will extend beyond the deck of the car; and that if the ends of the rails do project, it is because of careless loading, or is the result of displacement in transit; and, further, that such displacement is not an uncommon occurrence,—in fact, according to defendant's witnesses, it is to be expected. It is also to be noticed that, according to these same witnesses, whenever such material projected so far as to endanger an adjoining car, it was customary to put the rails in place, either by moving them by hand, or by pushing them back, using heavy timbers and a locomotive,—"butting" them, as one witness expressed it.

The evidence as to the condition of the car when left at Traverse was not very clear or convincing. That the rails had commenced to slide out of place, and were becoming more or less dangerous to those who might be called on to couple the flat to another car, and that this was known by one or two of the men at work upon the train which left the flat, was shown. This evidence of what was seen and known when the car was left on the siding some 30 hours before Corbin was killed tended to show that the condition of the load made the car, actually or prospectively, dangerous to handle, and that the company knew, or was bound to know, that it was unfit to be taken up in any other train. If the company knew, or should have known, of the danger which actually existed, or which was to be apprehended, can it be said that, with means at hand to change the conditions, it was not negligent when it allowed the car to be removed from the siding?

Now, when the car came to Sleepy Eye its condition was seen and specially noticed by the conductor. He would not testify upon

the trial that it was then a "bad-order" car, and under the rules of the company should have been set out of the train and reported, but he admitted that its load was not in good order for further transportation, and that it was hazardous to handle. Evidently, it was for this reason that he cautioned Corbin to look out for the rails when he gave him the order to bring the sections of the train together.

We think that, taking into consideration the condition of the car when it was left at Traverse, the time it remained there, the fact that it was well known that this kind of freight was very apt to slide back and forth and become perilous to the men in charge, the fact that its positively dangerous condition was specially noticed and appreciated by the conductor when the train reached Sleepy Eye station, that there was then afforded an opportunity to remove the danger, either by side-tracking the car as in bad order or by adjusting the load of rails in one of the ways heretofore mentioned as customary when other cars were liable to be injured, we cannot say as a matter of law that appellant company was not negligent in permitting the flat to remain in the train, a continuing menace to the life and limb of the trainmen.

We now reach the question of contributory negligence, and the established law is that there must be a want of ordinary care, under the circumstances of the case, contributing to the injury as an efficient and proper cause thereof, before contributory negligence can exist. If the negligence, amounting to the absence of ordinary care, shall contribute, proximately, in any degree, no recovery can be had. If, then, Corbin exercised ordinary care and prudence in the discharge of his duty, he cannot be charged with negligence of the character demanded to defeat a recovery.

We have stated the manner in which the accident happened, in so far as it was ascertainable from the surroundings. Corbin must have properly and carefully performed all that was required of him up to the time that he undertook to withdraw his stooped body and his bowed head from beneath the protruding rails, as the cars moved slowly along the track, immediately after the connection was made. He was in a hazardous place, and had to act with some haste, for the cars were not wholly stationary. He could not act with the deliberation of one who, in the same position of the body,

is retreating from beneath a fixed object, and no such deliberateness of movement could be expected of him. He raised his head a second too soon, and a trifle too high, and it was immediately pinned against the box car by the end of a rail, four feet and an inch from the ground. He miscalculated the distances, or misjudged his position; and yet he may have been taking great care to avoid doing that very thing, for is it not a matter of common experience and knowledge that persons stooping down and engaged in backing out from beneath some stationary object may do as did Corbin, although exercising great care to avoid it? He was in the discharge of his duty in placing himself in a perilous position, a duty the performance of which was known to, was sanctioned, and even required by, the defendant company. The fact that he was in such a position does not absolutely prove that he was not exercising the care required of him. The question of due care in such a case depends on the manner in which Corbin performed the duty incumbent on him,—whether he acted with due skill and caution, and observed ordinary care. That he was caught at the last moment, just as he was about to escape from the danger, is not conclusive upon the question of negligence on his part. It was proper, therefore, to submit it to the jury for determination.

We have carefully examined the various assignments of error, and conclude that further reference to or discussion of them is unnecessary.

Order affirmed.