HATTIE BURRIS v. MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY COMPANY.[1]

May 26, 1905.

Nos. 14,259—(78).[2]

**Contributory Negligence.**

A conductor in charge of a freight train proceeding along the main track between stations on an upgrade curve found the engine unable to pull the train, and it became stalled. Considerable time was consumed in trying to go ahead by setting the brakes and taking up slack, and, in so maneuvering, the train drifted back down the grade from two hundred

1 Reported in 103 N. W. 717.          2 April, 1905, term.

to three hundred feet, there colliding with an engine, resulting in injuries to the conductor which caused his death. *Held*, he was guilty of contributory negligence in not complying with the rule which required him to send back a flagman.

Action in the district court for Ramsey county by plaintiff as administratrix of the estate of Oliver L. Burris, deceased, to recover $5,000 for the death of decedent. The case was tried before Orr, J., and a jury, which rendered a verdict in favor of plaintiff for $4,000. From an order granting a motion for judgment in favor of defendant notwithstanding the verdict, plaintiff appealed. Affirmed.

*Samuel A. Anderson,* for appellant.

*Alfred H. Bright* and *Munn & Thygeson,* for respondent.

LEWIS, J.

Plaintiff's intestate was a freight conductor upon defendant's road, and about five o'clock in the afternoon of May 27, 1903, left the terminal station at Minneapolis in charge of his train, which consisted of at least sixteen cars—seven loaded box cars, seven empty cars, two flat cars, and a caboose. A witness for plaintiff placed the number of cars at eighteen or twenty. The train was going in an easterly direction over the main track. For a considerable distance from the starting point there was a heavy upgrade, and at the point of the accident, about a mile from Shoreham, the train stalled. From this point on there is a conflict of evidence, but either one of two things occurred. As asserted by plaintiff: The conductor attempted to get over the grade by causing the brakes to be set on one or two of the rear cars, thus getting the benefit of the slack; that for some reason the train did not always hold when the brakes were set, and drifted downgrade two or three hundred feet, when the conductor, coming to the conclusion that he could not make any headway in that manner, stopped the train, and was standing at his post on the rear platform of the caboose, when a single engine approached from the rear, running about twenty miles an hour, and crashed into the train, before the conductor could carry out his intention to send back a signal. Or, as testified by defendant's witnesses: The conductor, finding the train stalled on the grade, and having made three or four efforts to advance by

the process of taking up the slack, proceeded to back down the grade for the purpose of reaching a point where he could make a start, and was engaged in backing when the train collided with the engine coming from the west. Whatever the facts were as to the manner of manipulating the train on the grade, it is undisputed that the engine and the train came together with such impact that two of the wheels of the engine were derailed, and the caboose thrown up on one end, landing on the bank at right angles to the track, falling upon the conductor as he was attempting to escape, causing injuries which resulted in his death the following day. A verdict was returned for plaintiff, and the court, on motion, ordered judgment for defendant notwithstanding the conceded neglect of defendant in running the single engine.

The case turns upon the point whether, as a matter of law, it appears from the evidence, taking the most favorable view of it for plaintiff, the conductor was guilty of contributory negligence in failing to send out the signals required by defendant's rules, which are as follows:

> No. 38. When a train stops or is delayed under circumstances in which it might be overtaken by a following train, a flagman must go back immediately with danger signals to stop any train moving in the same direction.
>
> No. 46. No train shall be run from one station to another with an engine behind it. Whenever in the absence of special order to do so it becomes necessary to back a train between stations, it must be done with great care, keeping a man constantly in advance of the rear end of the train the full distance prescribed in rule 31, to warn any train that may be approaching. In all cases of backing of train, a competent man, the conductor, if possible, must be stationed on the rear end of the last car to watch for signals or obstructions, and to signal the engineer and to stop the train whenever necessary.

The principal witness on the part of appellant was the head brakeman, Wilkins, and, giving full credence to his testimony, the following facts must be conceded for the purpose of this appeal: That the train consisted of eighteen or twenty cars; that the engine, at the time the train became stalled, had arrived at or just beyond Central ave-

nue; that the conductor and brakemen went on top of the rear cars to set brakes, and when this was done the train stopped, and the engine moved eastward, taking up the slack, which effort was once more repeated; that during the time so consumed in attempting to go forward the train drifted down the grade from two hundred to three hundred feet. He further testified that when the train became stalled he was near the front portion of it, and went back to help them set brakes; that the rear brakeman went down with the conductor into the caboose after trying to start the train by setting the brakes and taking up the slack; that during the second attempt to take up the slack the witness set the brakes himself; that the conductor was on the rear platform of the caboose when the witness saw the engine approaching from the rear, and at that time the train had run down the grade some two hundred or three hundred feet from the point where they first started. From the testimony of this witness it appears that the train was not under control during all of the time it was going downgrade, but at least twice during that period the train was brought to a standstill by setting the brakes for the purpose of taking up the slack. The place of the accident was on a decided upgrade curve. For the first six hundred or seven hundred feet beyond the accident to the west there was a fill, and the track was unobstructed, but from that point on westward there were other curves and cuts that largely obstructed the view of approaching trains.

It may be conceded that rule No. 46 had no application, for, as before stated, we must accept plaintiff's theory of the case, and whatever distance was made by the train in running back down the grade was not with the intention of backing the train in order to get down on a level spot for a fresh start, but came about as a result of manipulating the train, the manner of handling the brakes and giving signals. There were two courses open to the conductor: Either the one which the witness Wilkins testified he did pursue, viz., maintain a position on the grade, and advance from that point by taking the benefit of the slack; or backing up to a suitable starting point. If the latter course had been taken, then, under rule No. 46, it would have been the duty of the conductor to send back a flagman. On the other hand, if he pursued the course testified to by Wilkins, then it was the con-

95 M.—3

ductor's duty to immediately send out a flagman upon discovering that he could not start from the point on the grade where his train became stalled, and that it was necessary to make repeated trials, and in so doing found that his train was losing ground upon the grade. Considering the fact that there was a sharp curve,* with an obstructed view from the rear, and that the train was on the main track, and considering the time necessarily involved, it must be held, as a matter of law, the circumstances called upon the conductor to act immediately, and send back a flagman just as soon as it became apparent that he was losing ground and unable to go on up the grade. Under the most favorable view of the evidence, the conviction is unavoidable that several minutes were consumed in designedly backing the train or in drifting down the grade because the requisite number of brakes had not been set to hold it, during which time the train was in a place of peril. There is no evidence to support the claim that there was any necessity for the train drifting back because the brakes would not hold. The train was under the conductor's control, subject to his signals, and presumably was moved only by his orders.

The safety of employees and the traveling public require that the greatest care be taken in the movement of trains to avoid accidents. Rules and regulations are necessary, and the same were provided for that purpose. They cover the circumstances of this case. Rule No. 38 does not warrant the construction, when considered in connection with the conductor's duties and the hazards of the business, that he is vested with liberal discretion as to what circumstances require the enforcement of the rule. The order means that the conductor must not allow his train to occupy the track where other trains are likely to run without putting out a flagman; that he must act with all reasonable speed as soon as he discovers that his train is delayed. If he may maneuver his train upon a grade, as disclosed by this record, without regard to the danger to himself and others, then where is the line to be drawn? The rules were furnished the conductor for a given purpose. They were comprehensive, explicit, and reasonable, and it was the conductor's personal duty to see that the same were carried out. The reasonableness and application of rules for the operation of railroads are fully considered in Green v. Brainerd & N. M. Ry. Co., 85.

Minn. 318, 88 N. W. 974; Nordquist v. Great Northern Ry. Co., 89 Minn. 485, 95 N. W. 322; Scott v. Eastern Ry. Co., 90 Minn. 135, 95 N. W. 892.

Order affirmed