## JOSEPHA M. STEELE v. RED RIVER LUMBER COMPANY.[1]

February 18, 1910.

Nos. 16, 471—(229).

**Finding of Negligence — Evidence.**

The evidence was sufficient to justify the jury in finding that appellant was guilty of negligence in permitting a crew of section men to operate a hand car upon its tracks without giving proper signals.

**Violation of Train Rule — Contributory Negligence.**

It conclusively appears from the evidence that the conductor in charge of a train was guilty of negligence in violating a rule which required that, when a train was being pushed by an engine, a trainman be stationed in a conspicuous position on the leading car, with proper signals, to perceive the first signs of danger and immediately signal the engineer.

**Same — Defense not Proved.**

The evidence was not sufficient to prove that the rule was not customarily enforced and that the conductor was in the exercise of proper care in operating his train on the occasion of the accident.

[1]Reported in 124 N. W. 978.

---

[Note] As to contributory negligence of servant disobeying master's rules, see note in 24 L.R.A. 657.

Same.

The evidence was not sufficient to prove that the accident could not have been averted, had a trainman been stationed on the leading car.

Contributory Negligence — Erroneous Charge.

Contributory negligence on the part of an employee is established, when it appears from the evidence that he was negligent in any degree which proximately contributed to the result, and it was error to charge the jury that mere negligence on the part of the conductor would not be sufficient to prevent recovery, unless the negligence was the proximate cause of the accident.

Action in the district court for Hubbard county by the administratrix of the estate of James M. Steele, deceased, against the Great Northern Railway Company and the Red River Lumber Company to recover $5,000 for the wrongful death of plaintiff's intestate. The facts are stated in the opinion. On the trial at the close of plaintiff's case, her motion to dismiss the case as to the Great Northern Railway Company was granted and the motion of the railway company to direct a verdict in its favor was denied. The case was tried before Wright, J., and a jury to which were submitted specific questions, answered as indicated, as follows:

1. "Was the decedent, James M. Steele, in charge and control of the crew and train, on the trip on which the train in question was running at the time of the accident which resulted in his death?" "Yes."

2. "Was it the duty of Mr. Steele at and for fifteen minutes or more before the time of this collision to have either his brakeman or himself, Steele, on the top of the caboose watching ahead for signs of danger, and was it practicable to have had a man so stationed on said caboose during said time in a place and position where he could have properly performed said duty of watching ahead, and giving the stop signals in proper time and manner for the engineer to see and act on them?" "No."

3. "Was the decedent, James M. Steele, guilty of contributory negligence which proximately contributed to the resulting injury and death of Steele?" "No."

From an order denying the motion of defendant Red River Lumber Company for judgment notwithstanding the verdict or a new trial, it appealed. Reversed and a new trial granted.

*Thomas J. Davis* and *Davis & Hollister,* for appellant.

*Donohue & Stephens* and *Coppernoll & Woolley,* for respondent.

LEWIS, J.

Appellant company was engaged in operating a logging road in Hubbard county in 1906-1907. The line was about ten miles in length, ran in a north-westerly direction from the point of its connection with the Great Northern road about two miles from the village of Akeley. Several logging camps were in operation at different points along the line, and appellant operated a train daily between Akeley and Camp 22, a point about five miles out, for the purpose of carrying logs and distributing supplies to the camps and material for further construction at the end of the line. The train consisted of an engine, a caboose, which had been converted from a common box car, and whatever other cars were required to distribute materials and supplies. At a point four hundred or five hundred feet from Camp 22, it was customary to take cars loaded with gravel and haul them to the end of the line, where the gravel was dumped. Respondent's intestate, Mr. Steele, who was the conductor of this train, had been in the employ and charge of the train for about thirty days prior to the accident, which occurred on the sixth of December, 1907. The brakeman, Sargent, had been in the employ of the company only four days. The engineer and fireman were men experienced in their work. There was no general operating superintendent, but there was a chief engineer, who had employed Steele for appellant. There was also a superintendent of construction, Murray; but he had nothing to do with the operation of the train.

On the morning of the accident a train of four or five cars and the caboose was made up at Akeley, with the engine in the rear pushing or backing the train. At Camp 22 a new train was made up, consisting of seven car loads of gravel and the caboose in the lead, and the engine continued backing the train towards its destination. On leav-

ing Camp 22, Mr. Steele and his brakeman; Sargent, took their positions on the gravel cars for the purpose of setting brakes, and after proceeding a short distance the brakes were released and Steele went into the caboose followed in a few minutes by Sargent, and soon after both men had entered the caboose the train rounded a sharp curve and collided with a hand car propelling a push car coming from the opposite direction, which resulted in derailing the caboose, and as a result Mr. Steele lost his life.

The negligence charged in this action by his administrator was that appellant was negligent, in that the section crew propelling the hand car had failed to put out flag signals before attempting to round the curve. Among the defenses interposed, the company charged that Steele was guilty of contributory negligence, for the reason that he failed to properly control his train, and had violated a rule of the company which required him to keep a man stationed on the leading car when the train was backing. A verdict was returned for respondent.

1. We find the evidence sufficient to sustain the charge that the men running the hand car, which propelled the push car, had violated the rule which required section crews to put out signal flags whenever they were engaged in operating along the line. Although the evidence was not very clear that Steele knew such a rule had been promulgated, it was clearly established that it had been and was customarily followed. Steele had been the conductor of the train for about thirty days, and we consider the evidence sufficient to show that he had knowledge of the practice, and this has some bearing upon the question of contributory negligence.

2. Whether Steele had violated a rule of the company was a closely contested question at the trial. At the time Steele was employed by Mr. Kline, the chief engineer, he was told, in answer to his own question, that he was to operate the train under the rules of the Great Northern Railway Company. Steele had been in the employ of that company as a conductor for about seven years and was familiar with the rules, and after the accident a copy of them was found in his desk in the caboose. Rule No. 37 reads:

"When a train is being pushed by an engine (except when shifting and making up trains in yards) a trainman must be stationed in a conspicuous position on the front of the leading car with the proper signals so as to perceive the first sign of danger, and immediately signal the engineman."

Another portion of the rule reads: "Trainmen are stationed on cars solely for the purpose of preventing injury to the same by collision or otherwise, and other employees in yards, or about tracks, are charged with the duty of observing the movement of cars and protecting themselves from injury."

The point is made by respondent that this part of the rule limits the application of the entire rule to the preservation of property only, and that it has no reference to the personal safety of the parties engaged with its enforcement. We see no merit in this argument, and find no escape from the conclusion that the conductor understood that he was operating under the rules of the Great Northern Railway Company, and that it was his duty to keep a man stationed on the leading car when the train was being backed. But respondent insists that, considering the nature of the caboose and the general manner of operating the train, the rule had not been enforced, and that it was not practicable to enforce it on the occasion of the accident.

We have carefully considered these points, and the record compels a decision contrary to the views of respondent. The caboose was an ordinary box car, which had been made over by closing the sliding doors on either side and inserting therein an ordinary door, which opened on the inside with a regular door knob. Immediately to the left of this door was a window. There was also a window at each end of the car, which was about two feet from the floor of the car. There were no brakes on the inside. The car was fitted with the ordinary brake at each end, and a ladder was fastened at the side of the door, by which the top of the car could readily be reached. At right angles to the running board a plank five or six feet long was fastened about four inches above the footboard, and on the center of this was a place for a lantern. The train was equipped with air brakes and readily

·controlled from the engine. There is no evidence tending to show that the rule had been abandoned. The engineer testified that such was the custom. The brakeman, Sargent, who was a witness for respondent, admitted that it was his business to keep a lookout ahead when the train was running in that manner.

The practice of backing up a train without having a man stationed where he could look ahead and give signals would not be tolerated. There was necessity for the rule, and no other course could well be followed in the exercise of prudent railroading. There appears to have been no tangible reason for relaxing the rule and for not exercising the usual vigilance on this occasion. On the contrary, there was every reason for watchfulness at the particular point where this accident occurred.

According to Sargent's testimony, Steele had told him, very shortly before the collision, to come into the caboose, and soon after releasing the brake on the first gravel car Steele went into the caboose, followed by Sargent, who walked over the gravel cars, swung himself up on the caboose by means of the grab iron and ladder, walked over to about the middle, let himself down the ladder at the side of the door, went inside, and stood six or seven feet from the front window looking ahead; that Steele was standing near the stove, near the middle of the car looking toward the front; and that Murray, the superintendent of construction, was looking out of the side window. Sargent testified that he had not been in the car more than four or five minutes when the collision occurred. Murray, a witness for respondent, stated that he was looking out of the window on the left side of the car, and that Steele was sitting in a chair about the middle of the car. Murray stated that he was looking ahead, that the train was then on a sharp curve, and that he saw the hand car coming around the curve at a distance of about one hundred fifty feet, and immediately gave the signal out of the window for the engineer, but that the engineer could not see it, for the reason that his view was obstructed by the bank which intervened.

The train, including the engine, was about three hundred feet in length. The curve at the point of the collision was very sharp, so

that, if the engine could not be seen from the caboose at that particular time, the position of the conductor and his brakeman were absolutely useless for the purpose of keeping a watch ahead. They not only could not see the track the length of the train, but were powerless to warn the engineer of any danger.

Sargent testified that he went into the caboose to get warm, and because Steele had told him to come in, and also for the reason that he could not stand on the top of the caboose because of its slippery condition. Considerable evidence was taken with reference to the construction and condition of the caboose, and the climatic conditions, as bearing on the practicability of standing on the top of the caboose for the purpose of giving signals. Sargent said there was snow and ice on the running board, and that it was difficult for him to maintain a standing position on it while the train was in motion. One of respondent's witnesses stated that it was about fifteen degrees above zero. Other witnesses claimed that it was warm during the middle of the day, and the accident occurred about eleven o'clock in the forenoon. The engineer testified that he had noticed the top of the caboose on the morning of the accident, and did not see any ice or snow, and that Sargent had no trouble in walking on it when the train was moving.

In our judgment, the unfavorable condition as to the top of the car and the weather did not excuse the conductor for violating the rule. The entire train was under his management, and it was his duty to see that the caboose was in proper condition to enable the brakeman to perform his duties. The snow and ice, if there, could have been removed or covered with gravel, so that a man could have remained on top of the car, especially at critical points. If the speed of ten or twelve miles an hour was too great under the circumstances, then it should have been reduced to suit the conditions existing. The essential thing was to have the train under control in case of an emergency, and the evidence shows that the conductor did not attempt to adjust the running of the train according to the circumstances. He was familiar with the curve, and permitting his brakeman to enter and remain in the caboose at such a perilous time was gross negligence.

110 M.—15

Although this was the only train being operated on that line, the conductor had no right to relax his vigilance for that reason. The evidence does not sustain the claim that the train had the right of way with reference to section crews under all conditions, and that the conductor was at liberty to rely simply upon the vigilance of the section crew in obeying orders to flag ahead when using the track. Upon this branch of the case the conclusion is unavoidable that the conductor was guilty of negligence. As to the degree of care required by conductors, and those in charge of trains when acting under rules, see Nordquist v. Great Northern Ry. Co., 89 Minn. 485, 95 N. W. 322; Scott v. Eastern Ry. Co. of Minn., 90 Minn. 135, 95 N. W. 892; Burris v. Minneapolis, St. P. & S. S. M. Ry. Co., 95 Minn. 30, 103 N. W. 717; Elmgren v. Chicago, M. & St. P. Ry. Co., 102 Minn. 41, 112 N. W. 1067, 12 L. R. A. (N. S.) 754; MacDonald v. Minneapolis & St. L. R. Co., 108 Minn. 4, 120 N. W. 1023.

Respondent calls attention to certain evidence which is claimed to indicate that Murray, the construction superintendent, assumed charge of the train from Camp 22 to the end of the line. The evidence is too indefinite to support this claim. Murray had nothing to do with the operation of the train, but simply rode in the car in pursuance of his duties as superintendent of construction work.

3. We come now to the contention that, even if the rule had been complied with and the brakeman had been stationed on top of the leading car, yet, considering the circumstances under which the hand car approached and the speed of the train, it would have been impossible to avoid the collision and its consequences, and therefore the negligence of the conductor, if he was negligent, was not the proximate cause of the accident. A great deal of evidence was received as to the speed of the train and the hand car at the time of the collision, and the view between the engine and the caboose. There was evidence of certain tests subsequently made and supposed to be under similar conditions as to the range of vision from the top of such a car. Much of this evidence was of little probative force, but certain facts were established which form the basis of consideration on this branch of the case.

The footboard on the roof of the caboose was about eight feet above the floor of the car; hence the line of vision of a man standing on it would be about eight feet above the line of vision of one standing on the floor of the car inside, and the range of view of the man on top of the car would be correspondingly extended. While this is important, it is not the most essential feature. The man on top of the car would be able to act instantly upon discovering an obstruction on the track and give the emergency signal to the engineer, whose duty it was to be constantly on the watch. There was evidence tending to show that if the car was going ten or twelve miles an hour, and the air and steam brake were immediately applied by the engineer, the train could be stopped within fifty feet. Murray testified that he was looking ahead and first saw the approaching hand car when it was about one hundred fifty feet distant. The hand car was running four or five miles an hour, and the probabilities are that, even though it had been discovered by a man on top of the caboose, the signal immediately given, and the brakes applied, yet a collision would have occurred. But that a collision under those circumstances would have resulted in serious damage is highly improbable. The caboose was derailed by the first impact, and ran on the ties close to the rails before it upset. The engineer was not aware of this, and did not know anything was wrong until the air connection was broken by the upsetting of the car. If the brakes and air had been applied immediately upon discovery of the hand car by a man at a proper place of lookout, in all probability the speed could have been sufficiently lessened to have prevented the serious results which took place.

The court instructed the jury that plaintiff could not recover unless Mr. Steele came to his death by reason of some negligence of defendant which was the proximate cause thereof, but no special reference was made to this branch of the case. In denying appellant's motion for a new trial, the court expressed the opinion that the verdict should be sustained, for the reason that the evidence was sufficient to justify the jury in finding that the same result would have followed, even if a man had been on the top of the car. We have expressed our views

of the evidence, and are of opinion that the verdict ought not to be sustained.

4. Certain assignments of error are directed to portions of the court's instructions to the jury, one of which will be considered. That portion of the charge which stated that mere negligence on the part of the conductor would not be sufficient to prevent recovery, unless his negligence was the proximate cause of his death, was not a correct statement of the rule, which is that he could not recover if his negligence proximately contributed to the result in any degree. Corbin v. Winona & St. Peter R. Co., 64 Minn. 185, 66 N. W. 271.

We deem it unnecessary to refer to the other assignments. They will doubtless be remedied on another trial, after consideration of the cases above cited.

Reversed. New trial granted.